**UNITED STATES of America,**

v.

**BADALAMENTI, et al., Defendants.**

**In re Subpoena Served on Ivan FISHER, Esq.**

**No. S.S. 84 Cr. 236 (PNL).**

United States District Court, S.D. New York.

July 10, 1985.

As Amended July 23, 1985.

AMENDED OPINION AND ORDER

LEVAL, District Judge.

Ivan Fisher, Esq., attorney for the defendant Salvatore Catalano, moves to quash a trial subpoena *duces tecum* served upon him under Rule 17(c) by the Government. Defendant Catalano joins in the motion. The motion also is supported by amicus briefs of the National Association of Criminal Defense Lawyers and the New York Criminal Bar Association.

The subpoena commands that Mr. Fisher "testify . . . and produce . . . all documents . . . relating to" his fee arrangement with Catalano.[1]

The movants oppose the subpoena on numerous grounds including claims that it violates (i) Rule 17(c); (ii) the attorney-client privilege; (iii) the defendant's Sixth Amendment right to counsel; (iv) the defendant's privilege against self incrimination; (v) Mr. Fisher's privilege against self incrimination; and (vi) the defendant's right to redress a grievance under the First Amendment.

The Government argues that the subpoena violates none of the asserted privileges or rights and that it seeks proper evidence of Catalano's commission of the crimes charged by showing the element of "substantial income" derived from a "continuing criminal enterprise," ("CCE"), 21 U.S.C. § 848(b)(2)(B) and from a "pattern of racketeering activity" ("RICO"), 18 U.S.C. § 1962. The Government contends it has reason to believe that Mr. Fisher's fee is in the vicinity of $500,000 and that the evidence of Catalano's possession of such a sum to pay his attorney is proof of his revenues from narcotics trafficking. The Government has further asserted it may seek to seize those funds from Mr. Fisher under the provisions of the two statutes for forfeiture of the proceeds of such criminal activity, even after transfer to another per-

Rudolph W. Giuliani, U.S. Atty. S.D.N.Y., New York City, for the U.S.; Richard A. Martin, Asst. U.S. Atty., New York City, of counsel.

Ephraim Margolin, Nicholas C. Arguimbau, San Francisco, Cal., for Ivan Fisher, Esq.

Herman Kaufman, Austin V. Campriello, Henry J. Steinglass, New York City, for amicus curiae New York State Bar Ass'n.

Friedman & Atherton, Boston, Mass., for amicus curiae Nat. Ass'n of Crim. Defense Lawyers; Rikki J. Klieman, Boston, Mass., of counsel.

---

1. The Government disclaims any intention to compel testimony, stating that it seeks only the production of the documents evidencing the attorney's fee. The subpoena also excludes privileged documents.

son. 21 U.S.C. § 853(a), (c) and (n)(1)–(7) and 18 U.S.C. § 1963(a), (c) and (m)(1)–(7).

The issue of possible forfeiture of the attorney's fees arises as to both trial evidence, by which the Government may seek "a special verdict of forfeiture," 18 U.S.C. § 1963(c), 21 U.S.C. § 853(c), and to post-trial proceedings disputing the attorney's right to exemption from such forfeiture as a "bona fide purchaser for value ... without cause to believe that the property was subject to forfeiture." 21 U.S.C. § 853(n)(6)(B) and 18 U.S.C. § 1963(m)(6)(B).

### Forfeiture

■ In my view the Government's position as to the liability of Mr. Fisher's legal fee to forfeiture is not well taken and cannot serve as a basis to sustain the subpoena. I acknowledge that a literal reading of the two forfeiture statutes would seem to encompass the legal fee. But the liability to forfeiture of bona fide legal fees paid to the indicted defendant's trial attorney would raise such constitutional and ethical problems, I cannot conceive that this was intended by Congress, absent some indication in statute or legislative history. And if it had been intended, such application would in all likelihood violate the Sixth Amendment.

The two provisions enacted in the Comprehensive Forfeiture Act of 1984, Pub.L. No. 98–473, Title II, §§ 302, 303, 2301, 98 Stat. 2040, 2044, 2192, 2193, state that the "right, title, and interest in [the] property [subject to forfeiture] vests in the United States upon the commission of the act giving rise to forfeiture" and that "such property ... subsequently transferred to [another] person [may be forfeited] unless the transferee establishes ... that he is a bona fide purchaser for value ... who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture...." 18 U.S.C. § 1963(c), 21 U.S.C. § 853(c).

■ The statute is apparently intended to dissuade the commercial world from dealing with racketeers and traffickers, warning that one who accepts dirty money in payment for goods or services may forfeit it. To the jeweler, for example, the statute says "Don't sell diamonds to a racketeer. You may lose the proceeds."

No one is more on notice of likelihood that the money may come from such prohibited activity than the lawyer who is asked to represent the defendant in the trial of the indictment. If the statute applies to him, its message to him is "Do not represent this defendant or you will lose your fee." That being the kind of message lawyers are likely to take seriously, the defendant will find it difficult or impossible to secure representation. By the Sixth Amendment we guarantee the defendant the right of counsel, but by the forfeiture provisions of the RICO and CCE statute (if they apply to the fee of the defense attorney), we insure that no lawyer will accept the business. (I note in addition that the RICO and CCE indictments to which the forfeiture provisions apply are generally big cases requiring months to prepare and try, making it all the less likely that the attorney might take a chance on escaping forfeiture.)

That is only the beginning of the problems such construction of the statute would raise. A lawyer who was so foolish, ignorant, beholden or idealistic as to take the business would find himself in inevitable positions of conflict. His obligation to be well informed on the subject of his client's case would conflict with his interest in not learning facts that would endanger his fee by telling him his fee was the proceeds of illegal activity. If he made efforts to fight the forfeiture claiming he was "reasonably without cause to believe that the property was subject to forfeiture," the evidence on this issue would consist primarily of privileged matter confided to him by his client. He might furthermore be found to have accepted a contingent fee in a criminal case in violation of DR 2–106(C), since his retention of his fee would depend on gaining an acquittal in the client's trial. The statute would give attorneys a motive to negotiate a guilty plea that did not involve forfeiture,

rather than fight the case expending valuable time and increasing the risk of incurring forfeiture.

The question whether these statutes reach the defense attorney's fee was considered by the District Court for Colorado which, reviewing the scant legislative history and the rushed passage of the Comprehensive Forfeiture Act, concluded that the Act was not intended to, and did not, cover the attorney's bona fide fee for the defense of the criminal trial. *United States v. Rogers,* 602 F.Supp. 1332 (D.Colo.1985).

The question was considered again in this district in *United States v. Payden,* 605 F.Supp. 839, 849–850 n. 14 (S.D.N.Y. 1985), *rev'd on other grounds,* 767 F.2d 26 (2d Cir.1985). Judge Edelstein rejected the Colorado court's analysis. He reasoned that to exempt attorneys' fees from forfeiture would make lawyers conduits for the laundering of racketeering profits. He argued that if the statute was intended to prevent the racketeer from obtaining "a Rolls-Royce with the fruits of a crime, he cannot be permitted to obtain the services of the Rolls-Royce of attorneys from these same tainted funds," at 850 n. 14, noting (as I have above) that the defense attorney has clear notice that the funds may be the profits of illegal enterprise.

Although with great respect for the real concerns expressed by my colleague, I must agree with the *Rogers* court. Absent some supporting indication in the legislative history, I think it most doubtful that Congress can have intended by its broad language to cover a special application so clearly at odds with an accused defendant's constitutionally guaranteed right to have counsel to defend the charge.

Nothing of great value to the resolution has been cited from legislative history. The *Rogers* court found support for its position in the legislative history of a related bill, the Comprehensive Drug Penalty Act of 1984, which provides for restraining orders to protect the availability of property that may be subject to criminal forfeiture. The House Judiciary Committee Report stated, "Nothing in this section is intended to interfere with a person's Sixth Amendment right to counsel." H.R.Rep. No. 845, pt. 1, 98th Cong., 2d Sess. 19 n. 1 (1984).

The *Payden* opinion seeks to rebut this inference by the next sentence of the Report stating "The Committee ... does not resolve the conflict in District Court opinions on the use of restraining orders that impinge on a person's right to retain counsel in a criminal case." *Payden* reasons, "Congress intended, not to resolve the sixth amendment conflict through this legislation, but to leave the resolution of these issues to the courts." *Payden, supra,* at 849 n. 14.

In my view, the sentence noted in *Payden* addresses a different problem. It is the difficulty the accused may experience in hiring and paying a lawyer if the funds *of the accused* have been sequestered in anticipation of eventual forfeiture. It is true the accused whose money has been seized may have difficulty hiring *paid* counsel; on the other hand, he can make out an affidavit of indigency and obtain appointed counsel under the Criminal Justice Act. His right to counsel is not threatened. Like any other defendant without funds, he receives counsel although not counsel of his choice. The problem of the subsequent forfeiture of the fee paid to an attorney is different. The wealthy defendant cannot claim poverty and apply for appointed counsel. His problem is not inability to pay a legal fee but that lawyers will refuse to accept his retainer and will refuse to represent him. He can get neither a paid lawyer, nor a free one.

*Payden* describes the problem saying "The defendants in *Rogers* argued that the 'threat of forfeiture ... prevents them from using their assets to secure counsel of their choice.' If counsel cannot be paid, they will not work and the clients suffer." *Payden, supra,* at 849 n. 14. In my view the constitutional problem is not one of choice of counsel; nor is it one of getting retained lawyers to work. The problem is the unlikelihood of obtaining a lawyer *at all* if the lawyer will incur forfeiture of his

fee upon the client's conviction. The Government argues that forfeiture will be denied if the money is clean. This is true, but irrelevant. The right to counsel belongs to guilty defendants as well as innocent ones.

For all the reasons discussed above, I conclude that the statute was not intended, and should not be construed to reach bona fide fees charged by the attorney for the defense of the criminal charge. (And if the statute were so intended, I would be forced to conclude that in this application it ran afoul of the Sixth Amendment by effectively preventing the accused from exercising the right to counsel.)

This discussion has no application to a sham fee arrangement whereby the defendant might seek to bank his money with an attorney under the disguise of a fee. I do not suggest such an arrangement would be protected from forfeiture. There is, however, no contention that the fee here paid is anything but bona fide. Nor does the discussion apply to the seizure of funds *in the hands of the defendant* that he expects to use to pay his attorney. Nor does it necessarily apply to fees paid to attorneys for legal services other than the defense of the criminal trial which is secured by the Sixth Amendment. Those are different problems.

I conclude that the Government may not seek a special verdict as to forfeiture of these fees under 18 U.S.C. § 1963 or 21 U.S.C. § 853 and may not rely on forfeiture in support of the subpoena at issue.

### Proof of the Defendant's Illegal Profits

Use of the fee as evidence of the crimes charged presents a more difficult problem.

In *Grand Jury Subpoena Served Upon John Doe, Esq.*, 759 F.2d 968 (2d Cir.1985), a grand jury subpoena had been served on a RICO target's attorney seeking evidence that the attorney had received monies with respect to representation of twenty-one individuals believed to be involved with the client in an illegal venture. It was assumed by all that compliance with the subpoena would prevent the subpoenaed attorney from eventually appearing for his client at trial in the event of an indictment. The Court of Appeals ruled, in the face of such likely eventual disqualification, that the Government must show both relevance and need before the court would enforce the subpoena. Since no showing of need had, as yet, been made, the subpoena was ordered quashed.

A strong, and in my view highly persuasive dissent by Judge Timbers argued that the grand jury's right to investigate was paramount, that the information sought was highly relevant to the grand jury's investigation of organized crime and was not privileged, and that the Sixth Amendment right to counsel had not attached during preindictment grand jury investigation. Judge Timbers observed that the only loss to the client from enforcement of the subpoena would be to require him to use another lawyer and that this loss would arise only if the client were indicted, if the client wished to engage that lawyer as trial counsel and if the Government proposed to offer the evidence obtained through the subpoena of the attorney.

The Government argues that the rule in *John Doe, Esq.* should not apply to this case because the material here subpoenaed would not be likely to cause the withdrawal of Mr. Fisher and thus might not deprive Catalano of his chosen lawyer. I find to the contrary that this is an *a fortiori* case. The impact on the client's choice of lawyer in *John Doe, Esq.* pertained only to a possible future indictment as to which the right of counsel had not yet attached and as to which the client would have had the universe of lawyers, minus one, to choose from. Here the subpoena was not served until ten months after the return of the indictment and six months after Mr. Fisher's appearance in a case of gargantuan proportions. The loss to the defendant of his counsel under these circumstances would have a vastly greater impact on his Sixth Amendment rights. Both the majority and the dissent in *John Doe, Esq.* would seem to agree that its rule should apply to this circumstance.

I do not agree with the Government that this evidence is easily compatible with Mr. Fisher's continued representation. For him to be singled out among 22 attorneys by evidence that he earned a fee of one-half million dollars (or more) would damage Mr. Fisher's ability to represent his client effectively. Members of the jury might well resent the fee and see Mr. Fisher as an unconscionable partner in the narcotics business. Mr. Fisher may feel compelled to rebut the jurors' sentiments by testifying that he had not met his client until he was retained after indictment, and that his fee is in the normal range charged by lawyers of his standing for cases of this magnitude. Mr. Fisher's credibility would then be before the jury and these issues might become a distracting focus of the jury's attention. If there were circumstances to rebut the inference that Catalano had such sums available, such as that payment was expected to be spread over a number of years, or came in part from the defendant's parents, again Mr. Fisher could not testify to those facts without putting his credibility in issue. See *MacArthur v. Bank of New York*, 524 F.Supp. 1205, 1208 (S.D.N.Y.1981) (Sofaer, J.) ("[T]he bar is ill-served when an attorney's veracity becomes an issue in a case; lay observers especially might speculate whether counsel has compromised his integrity on the stand in order to prevail in the litigation"). The Government's argument that the fee could be introduced by stipulation overlooks those considerations, as well as the fact that this evidence would be damaging to other defendants as well and that they also might be unwilling to stipulate to it.

I recognize that the Disciplinary Rules requiring withdrawal of a lawyer who will be called as a witness provide an exception "[i]f the testimony will relate solely to the ... value of legal services rendered in the case...." DR 5–102(A); DR 5–101(B)(3). On the other hand, Disciplinary Rule 5–102(B) requires withdrawal if "it is apparent that [the attorney's] testimony is or may be prejudicial to his client." It is inevitable that advice to the jury singling out Mr. Fisher and advising that he earned

a fee of one-half million dollars or more would seriously compromise his ability to act effectively. It would place him at a great disadvantage as an advocate and would, probably as a practical matter, force his withdrawal. It would be no easy matter at this point for his client to replace him.

■ This does not necessarily make the evidence inadmissible. It does, however, demonstrate, contrary to the Government's argument, that the rule of *John Doe, Esq.* is applicable, requiring the Government to show both *relevance* and *need* to secure enforcement of the subpoena.

■ As to relevance, the Government contends the evidence that Catalano possessed $500,000 to pay his lawyer would prove the necessary element of his derivation of substantial profits from narcotics trafficking. I agree that it is relevant for this purpose, although not overwhelmingly persuasive. The Government concedes that Catalano is the owner of Catalano Bros. Bakery and a pizza restaurant. It is certainly within contemplation that the owner of two such businesses might have put aside, or be able to borrow, $500,000 and might use it to pay his lawyer if charged with an offense requiring a six-month trial and carrying a mandatory minimum penalty of 10 years. 21 U.S.C. § 848(a). Proof of Catalano's payment of such a fee in these circumstances is not the kind of unexplained wealth that adds significantly to the probability that the defendant was professionally engaged in crime. If, however, the jury finds from other evidence that the defendant was engaged in narcotics trafficking, the fee might well satisfy the "significant income" elements of RICO and CCE.

The Government argues that the relevance of the fee will increase because Catalano will offer proof of a modest lifestyle to rebut his involvement in large scale narcotics traffic. (See Gov't Memorandum, pp. 22–23.) The Government indicates no basis for the assertion that this will be "his chosen defense," other than the fact that

he made such arguments when seeking to have his bail reduced. It does not follow from the fact that a defendant argued modest means in seeking a bail reduction that he will necessarily make the same argument to disprove his involvement in drug dealings. The logical gap becomes wider on recognition that Catalano was represented by a different lawyer at the bail hearings. Nonetheless, it is certainly possible that Catalano might rely on such a strategy and if he does, the relevance of this evidence would, indeed, greatly increase.

As to the Government's obligation to demonstrate *need*, there is no decisional authority clarifying what it means since the *John Doe, Esq.* decision establishing the test dates from only two months ago. The Government's brief devotes little discussion to it except to say that it addresses a matter of "prosecutorial discretion and tactics" and that the courts should stay out of it. But I am required by the *Doe, Esq.* rule to assess need. Furthermore, the Government's position is overstated. Courts are repeatedly required to balance probative value against prejudice, which is a comparable task. *See, e.g., United States v. Figueroa,* 618 F.2d 934 (2d Cir. 1980) (Newman, J.); Rule 403, F.R.Evid.

I would assume that the need test of *Doe, Esq.* involves an assessment of the probative value and importance of the proof, the ability of the Government to acquire proof of the same facts or other proof of similar value from other sources and a weighing of these against an assessment of the prejudice to the defendant's Sixth Amendment right, both in terms of likelihood of occurrence and of seriousness.

In *Doe, Esq.*, considering the very slight and speculative future impact on the client's Sixth Amendment rights, the apparent high value of the evidence being sought, the small likelihood of obtaining it from any other source, and the fact that even if obtained from another source it would have the same effect of disqualifying the attorney, I would expect the Government would have little difficulty demonstrating need.

Here the circumstances are quite different. The subpoena is post-indictment. The subpoena was not served on Mr. Fisher until February 12, 1985, after Mr. Fisher had spent already close to six months in trial preparation, trial then being rescheduled only three months ahead. When the parties requested and were granted adjournment of trial to September, the Government consented to adjourn the making of motions against the subpoena to April 5. The Government did not file its answering brief until May 21, 1985; the reply brief was filed on June 18, 1985. Thus the matter came on for adjudication at a time when it would be most awkward and difficult to substitute a new attorney for Mr. Fisher. The affidavit of the Assistant advises that in September 1984 he told Mr. Fisher that "the Government would very likely serve Mr. Fisher with a subpoena" relating to his fee agreement. The factors which the Government now argue in support of the subpoena are the same ones the Assistant mentioned to Mr. Fisher in September upon the first conversation. I do not criticize the Government's attorney for courtesy in consenting to allow Mr. Fisher time to prepare his position on an important matter. I do, however, point out that the passage of time from September to July has substantially altered the impact of the issue on the defendant's ability to be represented at the September trial. Had the subpoena been served in September and the court been advised of the importance of early resolution, it would have been easier to resolve, one way or another, with less impact on the defendant's right to trial counsel. Now, the prejudice to the defendant resulting from the likely disqualification of Mr. Fisher will be very great. (Also, if a new attorney is hired by Catalano, the same problem may arise as to him or her.)

■ On the question of the importance of this proof to the Government, its need for this proof seems modest. As noted above, Catalano's access to such an amount is not incompatible with accumulated savings or borrowing power based on the earn-

ings of the bakery and the pizza restaurant. Furthermore, the Government has more compelling proof of Catalano's access to large sums, in that he has posted real property valued at three million dollars to secure his bail. Secondly, the Government can muster substantially equivalent proof without posing the same problems for the continuing representation of the defendant. It could do this by offering expert testimony on the fees charged by criminal defense attorneys for a case of these dimensions. For example, if the Government had found in the defendant's possession a collection of jewels and rare coins and wished to prove what the defendant had paid for them for the same purpose of showing profits derived from the illegal enterprise, in the absence of proof of the actual purchase prices the Government could offer expert testimony as to the market value for such objects. I see no reason why the Government could not proceed in the same fashion through expert testimony to establish the market range in 1984 for the services of criminal lawyers in cases of six months' duration requiring many months to prepare. Such evidence would give the Government exactly what it seeks—proof that Catalano must have expended several hundred thousand dollars—without focusing on Mr. Fisher and putting him in the untenable position of inviting the jury to speculate that the trial attorney occupies the position of counsel to the board of directors of a racketeering enterprise.

The Government's need for the specific evidence of Mr. Fisher's fee could be far more extreme if, as noted above, Catalano seeks to offer evidence of his own modest resources to rebut his involvement in drug trafficking. For Catalano to offer evidence of modest means that did not include the funds necessary to pay the fee would give the Government a strong argument that the door had been opened to proof of the fee, regardless of possible prejudice to Mr. Fisher's effectiveness with the jury. It would seem then that Catalano could not, as a practical matter, offer (or argue) such evidence unless he included full allowance for the payment of Mr. Fisher's fee (with-

out necessity of telling the jury what the funds were used for). Accordingly, Catalano is on notice that any such contention that does not fully reflect the funds needed to pay the fee will throw open the issue of the attorney's fee.

In conclusion, to sustain the subpoena under these circumstances the Government must show relevance and need. It has shown relevance but has failed to show need. Accordingly, the motion to quash the subpoena must be granted. See *John Doe, Esq., supra.* On the other hand, proof by Catalano of modest means that does not include the funds needed to pay the fee would open the door and satisfy the requirement of need.

### Fifth Amendment

■ Alongside his arguments to quash the subpoena, Mr. Fisher asserts his right under the Fifth Amendment to refuse to respond to the subpoena and demands that immunity be conferred on him under 18 U.S.C. § 6002. The Government's argument that he is not entitled to plead the Fifth Amendment is unpersuasive. Mr. Fisher points to the possibility that he could be charged with commingling and theft of Government property if the Government's position on the liability of the fee to forfeiture is sustained, as well as the possibility that he could be charged with complicity in the manner suggested by the discussion in *Doe, Esq., supra.* Although it is doubtful that Mr. Fisher in fact fears prosecution, one who would plead the Fifth Amendment is not put to such a test. The Government argues that Mr. Fisher's stationary proclaims him to be a professional corporation and thus ineligible to plead the Fifth Amendment. It is sufficient answer to this that the Government's subpoena was addressed to Ivan Fisher, Esq. in person and not to the professional corporation.

■ Although Mr. Fisher's invocation of the Fifth Amendment is not a basis for

202

quashing the subpoena, it moots the issue of its enforceability.

SO ORDERED.