# CAPLIN & DRYSDALE, CHARTERED *v.* UNITED STATES

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 87–1729.   Argued March 21, 1989—Decided June 22, 1989

*Peter Van N. Lockwood* argued the cause for petitioner. With him on the briefs were *Graeme W. Bush, Albert G. Lauber, Jr., Julia L. Porter,* and *Robert L. Cohen.*

*Acting Solicitor General Bryson* argued the cause for the United States. With him on the briefs were *Assistant*

*Attorney General Dennis, Edwin S. Kneedler,* and *Sara Criscitelli.** 

JUSTICE WHITE delivered the opinion of the Court.

We are called on to determine whether the federal drug forfeiture statute includes an exemption for assets that a defendant wishes to use to pay an attorney who conducted his defense in the criminal case where forfeiture was sought. Because we determine that no such exemption exists, we must decide whether that statute, so interpreted, is consistent with the Fifth and Sixth Amendments. We hold that it is.

I

In January 1985, Christopher Reckmeyer was charged in a multicount indictment with running a massive drug importation and distribution scheme. The scheme was alleged to be a continuing criminal enterprise (CCE), in violation of 84 Stat. 1265, as amended, 21 U. S. C. § 848 (1982 ed., Supp. V). Relying on a portion of the CCE statute that authorizes forfeiture to the Government of "property constituting, or derived from . . . proceeds . . . obtained" from drug-law

---

*Joseph Beeler* and *Bruce J. Winick* filed a brief for the National Association of Criminal Defense Lawyers et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of California by *John K. Van de Kamp,* Attorney General, *Steve White,* Chief Assistant Attorney General, *John A. Gordnier,* Senior Assistant Attorney General, and *Gary W. Schons,* Deputy Attorney General; and for Eugene R. Anderson, *pro se.*

Briefs of *amici curiae* were filed for the American Bar Association by *Robert D. Raven, Charles G. Cole, Antonia B. Ianniello,* and *Terrance G. Reed;* and for the Appellate Committee of the California District Attorneys Association by *Ira Reiner, Harry B. Sondheim,* and *Arnold T. Guminski.*

violations, § 853(a),[1] the indictment sought forfeiture of specified assets in Reckmeyer's possession.    App. 33–40.    At this time, the District Court, acting pursuant to § 853(e)(1)(A),[2] entered a restraining order forbidding Reckmeyer to transfer any of the listed assets that were potentially forfeitable.

Sometime earlier, Reckmeyer had retained petitioner, a law firm, to represent him in the ongoing grand jury investigation which resulted in the January 1985 indictments.    Notwithstanding the restraining order, Reckmeyer paid the firm $25,000 for preindictment legal services a few days after the indictment was handed down; this sum was placed by petitioner in an escrow account.    Petitioner continued to represent Reckmeyer following the indictment.

---

[1] The forfeiture statute provides, in relevant part, that any person convicted of a particular class of criminal offenses

"shall forfeit to the United States, irrespective of any provision of State law—

"(1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation;

.        .        .        .        .

"The court, in imposing sentence on such person, shall order, in addition to any other sentence imposed . . . , that the person forfeit to the United States all property described in this subsection."    21 U. S. C. § 853(a) (1982 ed., Supp. V).

There is no question here that the offenses Reckmeyer was accused of in the indictment fell within the class of crimes triggering this forfeiture provision.

[2] The pretrial restraining order provision states that

"[u]pon application of the United States, the court may enter a restraining order or injunction . . . or take any other action to preserve the availability of property described in subsection (a) of [§ 853] for forfeiture under this section—

"(A) upon the filing of an indictment or information charging a violation . . . for which criminal forfeiture may be ordered under [§ 853] and alleging that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture under this section."    § 853(e)(1).

On March 7, 1985, Reckmeyer moved to modify the District Court's earlier restraining order to permit him to use some of the restrained assets to pay petitioner's fees; Reckmeyer also sought to exempt from any postconviction forfeiture order the assets that he intended to use to pay petitioner. However, one week later, before the District Court could conduct a hearing on this motion, Reckmeyer entered a plea agreement with the Government. Under the agreement, Reckmeyer pleaded guilty to the drug-related CCE charge, and agreed to forfeit all of the specified assets listed in the indictment. The day after the Reckmeyer's plea was entered, the District Court denied his earlier motion to modify the restraining order, concluding that the plea and forfeiture agreement rendered irrelevant any further consideration of the propriety of the court's pretrial restraints. App. 54–55. Subsequently, an order forfeiting virtually all of the assets in Reckmeyer's possession was entered by the District Court in conjunction with his sentencing. *Id.*, at 57–65.

After this order was entered, petitioner filed a petition under § 853(n), which permits third parties with an interest in forfeited property to ask the sentencing court for an adjudication of their rights to that property; specifically, § 853(n) (6)(B) gives a third party who entered into a bona fide transaction with a defendant a right to make claims against forfeited property, if that third party was "at the time of [the transaction] reasonably without cause to believe that the [defendant's assets were] subject to forfeiture." See also § 853 (c). Petitioner claimed an interest in $170,000 of Reckmeyer's assets, for services it had provided Reckmeyer in conducting his defense; petitioner also sought the $25,000 being held in the escrow account, as payment for preindictment legal services. Petitioner argued alternatively that assets used to pay an attorney were exempt from forfeiture under § 853, and if not, the failure of the statute to provide such an exemption rendered it unconstitutional. The District Court granted petitioner's claim for a share of the forfeited assets.

A panel of the Fourth Circuit affirmed, finding that—while § 853 contained no statutory provision authorizing the payment of attorney's fees out of forfeited assets—the statute's failure to do so impermissibly infringed a defendant's Sixth Amendment right to the counsel of his choice. *United States* v. *Harvey*, 814 F. 2d 905 (1987). The Court of Appeals agreed to hear the case en banc and reversed. *Sub nom. In re Forfeiture Hearing as to Caplin & Drysdale, Chartered*, 837 F. 2d 637 (1988). All the judges of the Fourth Circuit agreed that the language of the CCE statute acknowledged no exception to its forfeiture requirement that would recognize petitioner's claim to the forfeited assets. A majority found this statutory scheme constitutional, *id.*, at 642–648; four dissenting judges, however, agreed with the panel's view that the statute so construed violated the Sixth Amendment, *id.*, at 651–653 (Phillips, J., dissenting).

Petitioner sought review of the statutory and constitutional issues raised by the Court of Appeals' holding. We granted certiorari, 488 U. S. 940 (1988), and now affirm.

## II

Petitioner's first submission is that the statutory provision that authorizes pretrial restraining orders on potentially forfeitable assets in a defendant's possession, 21 U. S. C. § 853 (e) (1982 ed., Supp. V), grants district courts equitable discretion to determine when such orders should be imposed. This discretion should be exercised under "traditional equitable standards," petitioner urges, including a "weigh[ing] of the equities and competing hardships on the parties"; under this approach, a court "must invariably strike the balance so as to allow a defendant [to pay] . . . for *bona fide* attorneys fees," petitioner argues. Brief for Petitioner 8. Petitioner further submits that once a district court so exercises its discretion, and fails to freeze assets that a defendant then uses to pay an attorney, the statute's provision for recapture of

forfeitable assets transferred to third parties, § 853(c), may not operate on such sums.

Petitioner's argument, as it acknowledges, is based on the view of the statute expounded by Judge Winter of the Second Circuit in his concurring opinion in that Court of Appeals' en banc decision, *United States* v. *Monsanto*, 852 F. 2d 1400, 1405–1411 (1988). We reject this interpretation of the statute today in our decision in *United States* v. *Monsanto, ante,* p. 600, which reverses the Second Circuit's holding in that case. As we explain in our *Monsanto* decision, *ante,* at 611–614, whatever discretion § 853(e) provides district court judges to refuse to enter pretrial restraining orders, it does not extend as far as petitioner urges—nor does the exercise of that discretion "immunize" nonrestrained assets from subsequent forfeiture under § 853(c), if they are transferred to an attorney to pay legal fees. Thus, for the reasons provided in our opinion in *Monsanto,* we reject petitioner's statutory claim.

## III

We therefore address petitioner's constitutional challenges to the forfeiture law.[3] Petitioner contends that the statute

[3]The United States argues that petitioner lacks *jus tertii* standing to advance Reckmeyer's Sixth Amendment rights. See Brief for United States 35, and n. 17. Though the argument is not without force, we conclude that petitioner has the requisite standing.

When a person or entity seeks standing to advance the constitutional rights of others, we ask two questions: first, has the litigant suffered some injury-in-fact, adequate to satisfy Article III's case-or-controversy requirement; and second, do prudential considerations which we have identified in our prior cases point to permitting the litigant to advance the claim? See *Singleton* v. *Wulff,* 428 U. S. 106, 112 (1976). As to the first inquiry, there can be little doubt that petitioner's stake in $170,000 of the forfeited assets—which it would almost certainly receive if the Sixth Amendment claim it advances here were vindicated—is adequate injury-in-fact to meet the constitutional minimum of Article III standing.

The second inquiry—the prudential one—is more difficult. To answer this question, our cases have looked at three factors: the relationship of the litigant to the person whose rights are being asserted; the ability of the

infringes on criminal defendants' Sixth Amendment right to counsel of choice, and upsets the "balance of power" between the Government and the accused in a manner contrary to the Due Process Clause of the Fifth Amendment. We consider these contentions in turn.

## A

Petitioner's first claim is that the forfeiture law makes impossible, or at least impermissibly burdens, a defendant's right "to select and be represented by one's preferred attorney." *Wheat* v. *United States,* 486 U. S. 153, 159 (1988). Petitioner does not, nor could it defensibly do so, assert that impecunious defendants have a Sixth Amendment right to choose their counsel. The Amendment guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so .long as they are adequately represented by attorneys appointed by the courts. "[A] defendant may not insist on representation by an attorney he cannot afford." *Wheat, supra,* at 159. Petitioner does not dispute these propositions. Nor does the Government deny that the Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without

person to advance his own rights; and the impact of the litigation on third-party interests. See, *e. g., Craig* v. *Boren,* 429 U. S. 190, 196 (1976); *Singleton* v. *Wulff, supra,* at 113–118; *Eisenstadt* v. *Baird,* 405 U. S. 438, 443–446 (1972). The second of these three factors counsels against review here: as *Monsanto, ante,* p. 600, illustrates, a criminal defendant suffers none of the obstacles discussed in *Wulff, supra,* at 116–117, to advancing his own constitutional claim. We think that the first and third factors, however, clearly weigh in petitioner's favor. The attorney-client relationship between petitioner and Reckmeyer, like the doctor-patient relationship in *Baird,* is one of special consequence; and like *Baird,* it is credibly alleged that the statute at issue here may "materially impair the ability of" third persons in Reckmeyer's position to exercise their constitutional rights. See *Baird, supra,* at 445. Petitioner therefore satisfies our requirements for *jus tertii* standing.

funds. Applying these principles to the statute in question here, we observe that nothing in § 853 prevents a defendant from hiring the attorney of his choice, or disqualifies any attorney from serving as a defendant's counsel. Thus, unlike *Wheat*, this case does not involve a situation where the Government has asked a court to prevent a defendant's chosen counsel from representing the accused. Instead, petitioner urges that a violation of the Sixth Amendment arises here because of the forfeiture, at the instance of the Government, of assets that defendants intend to use to pay their attorneys.

Even in this sense, of course, the burden the forfeiture law imposes on a criminal defendant is limited. The forfeiture statute does not prevent a defendant who has nonforfeitable assets from retaining any attorney of his choosing. Nor is it necessarily the case that a defendant who possesses nothing but assets the Government seeks to have forfeited will be prevented from retaining counsel of choice. Defendants like Reckmeyer may be able to find lawyers willing to represent them, hoping that their fees will be paid in the event of acquittal, or via some other means that a defendant might come by in the future. The burden placed on defendants by the forfeiture law is therefore a limited one.

Nonetheless, there will be cases where a defendant will be unable to retain the attorney of his choice, when that defendant would have been able to hire that lawyer if he had access to forfeitable assets, and if there was no risk that fees paid by the defendant to his counsel would later be recouped under § 853(c).[4] It is in these cases, petitioner argues, that the Sixth Amendment puts limits on the forfeiture statute.

---

[4] That section of the statute, which includes the so-called "relation back" provision, states:

"All right, title, and interest in property described in [§ 853] vests in the United States upon the commission of .the act giving rise to forfeiture under this section. Any such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be forfeited to the United States, unless the transferee establishes" his entitlement to such property pursuant to § 853(n), discussed *supra*. 21 U. S. C. § 853(c) (1982 ed., Supp. V).

This submission is untenable. Whatever the full extent of the Sixth Amendment's protection of one's right to retain counsel of his choosing, that protection does not go beyond "the individual's right to spend his own money to obtain the advice and assistance of . . . counsel." *Walters* v. *National Assn. of Radiation Survivors*, 473 U. S. 305, 370 (1985) (STEVENS, J., dissenting). A defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice. A robbery suspect, for example, has no Sixth Amendment right to use funds he has stolen from a bank to retain an attorney to defend him if he is apprehended. The money, though in his possession, is not rightfully his; the Government does not violate the Sixth Amendment if it seizes the robbery proceeds and refuses to permit the defendant to use them to pay for his defense. "[N]o lawyer, in any case, . . . has the right to . . . accept stolen property, or . . . ransom money, in payment of a fee. . . . The privilege to practice law is not a license to steal." *Laska* v. *United States*, 82 F. 2d 672, 677 (CA10 1936). Petitioner appears to concede as much, see Brief for Petitioner 40, n. 25, as respondent in *Monsanto* clearly does, see Brief for Respondent in No. 88–454, pp. 36–37.

Petitioner seeks to distinguish such cases for Sixth Amendment purposes by arguing that the bank's claim to robbery proceeds rests on "pre-existing property rights," while the Government's claim to forfeitable assets rests on a "penal statute" which embodies the "fictive property-law concept of . . . relation-back" and is merely "a mechanism for preventing fraudulent conveyances of the defendant's assets, not . . . a device for determining true title to property." Brief for Petitioner 40–41. In light of this, petitioner contends, the burden placed on defendant's Sixth Amendment rights by the forfeiture statute outweighs the Government's interest in forfeiture. *Ibid.*

The premises of petitioner's constitutional analysis are unsound in several respects. First, the property rights given the Government by virtue of the forfeiture statute are more substantial than petitioner acknowledges. In § 853(c), the so-called "relation-back" provision, Congress dictated that "[a]ll right, title and interest in property" obtained by criminals via the illicit means described in the statute "vests in the United States upon the commission of the act giving rise to forfeiture." 21 U. S. C. § 853(c) (1982 ed., Supp. V). As Congress observed when the provision was adopted, this approach, known as the "taint theory," is one that "has long been recognized in forfeiture cases," including the decision in *United States* v. *Stowell*, 133 U. S. 1 (1890). See S. Rep. No. 98–225, p. 200, and n. 27 (1983). In *Stowell*, the Court explained the operation of a similar forfeiture provision (for violations of the Internal Revenue Code) as follows:

> "As soon as [the possessor of the forfeitable asset committed the violation] of the internal revenue laws, the forfeiture under those laws took effect, and (though needing judicial condemnation to perfect it) operated from that time as a statutory conveyance to the United States of all the right, title and interest then remaining in the [possessor]; and was as valid and effectual, against all the world, as a recorded deed. The right so vested in the United States could not be defeated or impaired by any subsequent dealings of the . . . [possessor]." *Stowell, supra,* at 19.

In sum, § 853(c) reflects the application of the long-recognized and lawful practice of vesting title to any forfeitable assets, in the United States, at the time of the criminal act giving rise to forfeiture. Concluding that Reckmeyer cannot give good title to such property to petitioner because he did not hold good title is neither extraordinary or novel. Nor does petitioner claim, as a general proposition that the relation-back provision is unconstitutional, or that Congress cannot, as a general matter, vest title to assets derived from the crime in

the Government, as of the date of the criminal act in question. Petitioner's claim is that whatever part of the assets that is necessary to pay attorney's fees cannot be subjected to forfeiture. But given the Government's title to Reckmeyer's assets upon conviction, to hold that the Sixth Amendment creates some right in Reckmeyer to alienate such assets, or creates a right on petitioner's part to receive these assets, would be peculiar.

There is no constitutional principle that gives one person the right to give another's property to a third party, even where the person seeking to complete the exchange wishes to do so in order to exercise a constitutionally protected right. While petitioner and its supporting *amici* attempt to distinguish between the expenditure of forfeitable assets to exercise one's Sixth Amendment rights, and expenditures in the pursuit of other constitutionally protected freedoms, see, *e. g.*, Brief for American Bar Association as *Amicus Curiae* 6, there is no such distinction between, or hierarchy among, constitutional rights. If defendants have a right to spend forfeitable assets on attorney's fees, why not on exercises of the right to speak, practice one's religion, or travel? The full exercise of these rights, too, depends in part on one's financial wherewithal; and forfeiture, or even the threat of forfeiture, may similarly prevent a defendant from enjoying these rights as fully as he might otherwise. Nonetheless, we are not about to recognize an antiforfeiture exception for the exercise of each such right; nor does one exist for the exercise of Sixth Amendment rights.[5]

---

[5] It would be particularly odd to recognize the Sixth Amendment as a defense to forfeiture, because forfeiture is a substantive charge in the indictment against a defendant. Thus, petitioner asks us to take the Sixth Amendment's guarantee of counsel "for his defense" and make that guarantee *petitioner's defense* to the indictment. We doubt that the Amendment's guarantees, which are procedural in nature, cf. *Faretta* v. *California*, 422 U. S. 806, 818 (1975), provide such a substantive defense to charges against an accused.

Petitioner's "balancing analysis" to the contrary rests substantially on the view that the Government has only a modest interest in forfeitable assets that may be used to retain an attorney. Petitioner takes the position that, in large part, once assets have been paid over from client to attorney, the principal ends of forfeiture have been achieved: dispossessing a drug dealer or racketeer of the proceeds of his wrongdoing. See Brief for Petitioner 39; see also 814 F. 2d, at 924–925. We think that this view misses the mark for three reasons.

First, the Government has a pecuniary interest in forfeiture that goes beyond merely separating a criminal from his ill-gotten gains; that legitimate interest extends to recovering *all* forfeitable assets, for such assets are deposited in a Fund that supports law-enforcement efforts in a variety of important and useful ways. See 28 U. S. C. § 524(c), which establishes the Department of Justice Assets Forfeiture Fund. The sums of money that can be raised for law-enforcement activities this way are substantial,[6] and the Government's interest in using the profits of crime to fund these activities should not be discounted.

Second, the statute permits "rightful owners" of forfeited assets to make claims for forfeited assets before they are retained by the Government. See 21 U. S. C. § 853(n)(6)(A). The Government's interest in winning undiminished forfeiture thus includes the objective of returning property, in full, to those wrongfully deprived or defrauded of it. Where the Government pursues this restitutionary end, the Government's interest in forfeiture is virtually indistinguishable from its interest in returning to a bank the proceeds of a bank robbery; and a forfeiture-defendant's claim of right to use

---

[6] For example, just one of the assets which Reckmeyer agreed to forfeit, a parcel of land known as "Shelburne Glebe," see App. 57 (forfeiture order), was recently sold by federal authorities for $5.3 million. Washington Post, May 10, 1989, p. D1, cols. 1–4. The proceeds of the sale will fund federal, state, and local law-enforcement activities. *Ibid.*

such assets to hire an attorney, instead of having them returned to their rightful owners, is no more persuasive than a bank robber's similar claim.

Finally, as we have recognized previously, a major purpose motivating congressional adoption and continued refinement of the racketeer influenced and corrupt organizations (RICO) and CCE forfeiture provisions has been the desire to lessen the economic power of organized crime and drug enterprises. See *Russello* v. *United States*, 464 U. S. 16, 27–28 (1983). This includes the use of such economic power to retain private counsel. As the Court of Appeals put it: "Congress has already underscored the compelling public interest in stripping criminals such as Reckmeyer of their undeserved economic power, and part of that undeserved power may be the ability to command high-priced legal talent." 837 F. 2d, at 649. The notion that the Government has a legitimate interest in depriving criminals of economic power, even insofar as that power is used to retain counsel of choice, may be somewhat unsettling. See, *e. g.*, Tr. of Oral Arg. 50–52. But when a defendant claims that he has suffered some substantial impairment of his Sixth Amendment rights by virtue of the seizure or forfeiture of assets in his possession, such a complaint is no more than the reflection of "the harsh reality that the quality of a criminal defendant's representation frequently may turn on his ability to retain the best counsel money can buy." *Morris* v. *Slappy*, 461 U. S. 1, 23 (1983) (BRENNAN, J., concurring in result). Again, the Court of Appeals put it aptly: "The modern day Jean Valjean must be satisfied with appointed counsel. Yet the drug merchant claims that his possession of huge sums of money . . . entitles him to something more. We reject this contention, and any notion of a constitutional right to use the proceeds of crime to finance an expensive defense." 837 F. 2d, at 649.[7]

---

[7] We also reject the contention, advanced by *amici*, see, *e. g.*, Brief for American Bar Association as *Amicus Curiae* 20–22, and accepted by some courts considering claims like petitioner's, see, *e. g.*, *United States* v. *Rogers*, 602 F. Supp. 1332, 1349–1350 (Colo. 1985), that a type of *"per se"* in-

It is our view that there is a strong governmental interest in obtaining full recovery of all forfeitable assets, an interest that overrides any Sixth Amendment interest in permitting criminals to use assets adjudged forfeitable to pay for their defense. Otherwise, there would be an interference with a defendant's Sixth Amendment rights whenever the Government freezes or takes some property in a defendant's possession before, during, or after a criminal trial. So-called "jeopardy assessments" — Internal Revenue Service (IRS) seizures of assets to secure potential tax liabilities, see 26 U. S. C. § 6861 — may impair a defendant's ability to retain counsel in a way similar to that complained of here. Yet these assessments have been upheld against constitutional attack,[8] and we note that the respondent in *Monsanto* concedes their constitutionality, see Brief for Respondent in No. 88–454, p. 37, n. 20. Moreover, petitioner's claim to a share of the forfeited assets postconviction would suggest that the Government could never impose a burden on assets within a defendant's control that could be used to pay a lawyer.[9] Criminal defendants, however, are not exempted

---

effective assistance of counsel results — due to the particular complexity of RICO or drug-enterprise cases — when a defendant is not permitted to use assets in his possession to retain counsel of choice, and instead must rely on appointed counsel. If such an argument were accepted, it would bar the trial of indigents charged with such offenses, because those persons would have to rely on appointed counsel — which this view considers *per se* ineffective.

If appointed counsel is ineffective in a particular case, a defendant has resort to the remedies discussed in *Strickland* v. *Washington*, 466 U. S. 668 (1984). But we cannot say that the Sixth Amendment's guarantee of effective assistance of counsel is a guarantee of a privately retained counsel in every complex case, irrespective of a defendant's ability to pay.

[8] See, *e. g.*, *Avco Delta Corporation Canada Ltd.* v. *United States*, 484 F. 2d 692 (CA7 1973); *Summers* v. *United States*, 250 F. 2d 132, 133–135 (CA9 1957); *United States* v. *Brodson*, 241 F. 2d 107, 109–111 (CA7 1957) (en banc).

[9] A myriad of other law-enforcement mechanisms operate in a manner similar to IRS jeopardy assessments, and might also be subjected to Sixth

from federal, state, and local taxation simply because these financial levies may deprive them of resources that could be used to hire an attorney.

We therefore reject petitioner's claim of a Sixth Amendment right of criminal defendants to use assets that are the Government's—assets adjudged forfeitable, as Reckmeyer's were—to pay attorney's fees, merely because those assets are in their possession.[10]   See also *Monsanto, ante,* at 613,

Amendment invalidation if petitioner's claim were accepted.   See Brickey, Attorneys' Fee Forfeitures, 36 Emory L. J. 761, 770–772 (1987).

[10] Petitioner advances three additional reasons for invalidating the forfeiture statute, all of which concern possible ethical conflicts created for lawyers defending persons facing forfeiture of assets in their possession. See Brief for Petitioner 35–37; see also Brief for American Bar Association as *Amicus Curiae* 17–22.

Petitioner first notes the statute's exemption from forfeiture of property transferred to a bona fide purchaser who was "reasonably without cause to believe that the property was subject to forfeiture." 21 U. S. C. § 853(n)(6)(B).   This provision, it is said, might give an attorney an incentive not to investigate a defendant's case as fully as possible, so that the lawyer can invoke it to protect from forfeiture any fees he has received. Yet given the requirement that any assets which the Government wishes to have forfeited must be specified in the indictment, see Fed. Rule Crim. Proc. 7(c)(2), the only way a lawyer could be a beneficiary of § 853(n)(6)(B) would be to fail to read the indictment of his client.   In this light, the prospect that a lawyer might find himself in conflict with his client, by seeking to take advantage of § 853(n)(6)(B), amounts to very little.   Petitioner itself concedes that such a conflict will, as a practical matter, never arise: a defendant's "lawyer . . . could not demonstrate that he was 'reasonably without cause to believe that the property was subject to forfeiture,'" petitioner concludes at one point.   Brief for Petitioner 31.

The second possible conflict arises in plea bargaining: petitioner posits that a lawyer may advise a client to accept an agreement entailing a more harsh prison sentence but no forfeiture—even where contrary to the client's interests—in an effort to preserve the lawyer's fee.   Following such a strategy, however, would surely constitute ineffective assistance of counsel.   We see no reason why our cases such as *Strickland* v. *Washington,* 466 U. S. 668 (1984), are inadequate to deal with any such ineffectiveness where it arises.   In any event, there is no claim that such conduct occurred here, nor could there be, as Reckmeyer's plea agreement included forfeit-

which rejects a similar claim with respect to pretrial orders and assets not yet judged forfeitable.

B

Petitioner's second constitutional claim is that the forfeiture statute is invalid under the Due Process Clause of the Fifth Amendment because it permits the Government to upset the "balance of forces between the accused and his accuser." *Wardius* v. *Oregon*, 412 U. S. 470, 474 (1973). We are not sure that this contention adds anything to petitioner's Sixth Amendment claim, because, while "[t]he Constitution guarantees a fair trial through the Due Process Clauses . . . it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment," *Strickland* v. *Washington*, 466 U. S. 668, 684–685 (1984). We have concluded above that the Sixth Amendment is not offended by the forfeiture provisions at issue here. Even if, however, the Fifth Amendment provides some added protection not encompassed in the Sixth Amendment's more specific provisions, we find petitioner's claim based on the Fifth Amendment unavailing.

---

ure of virtually every asset in his possession. Moreover, we rejected a claim similar to this one in *Evans* v. *Jeff D.*, 475 U. S. 717, 727–728 (1986).

Finally, petitioner argues that the forfeiture statute, in operation, will create a system akin to "contingency fees" for defense lawyers: only a defense lawyer who wins acquittal for his client will be able to collect his fees, and contingent fees in criminal cases are generally considered unethical. See ABA Model Rule of Professional Conduct 1.5(d)(2) (1983); ABA Model Code of Professional Responsibility DR 2–106(C) (1979). But there is no indication here that petitioner, or any other firm, has actually sought to charge a defendant on a contingency basis; rather the claim is that a law firm's prospect of collecting its fee may turn on the outcome at trial. This, however, may often be the case in criminal defense work. Nor is it clear why permitting contingent fees in criminal cases—if that is what the forfeiture statute does—violates a criminal defendant's Sixth Amendment rights. The fact that a federal statutory scheme authorizing contingency fees—again, if that is what Congress has created in § 853 (a premise we doubt)—is at odds with model disciplinary rules or state disciplinary codes hardly renders the federal statute invalid.

Forfeiture provisions are powerful weapons in the war on crime; like any such weapons, their impact can be devastating when used unjustly. But due process claims alleging such abuses are cognizable only in specific cases of prosecutorial misconduct (and petitioner has made no such allegation here) or when directed to a rule that is inherently unconstitutional. "The fact that the . . . Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it . . . invalid," *United States* v. *Salerno*, 481 U. S. 739, 745 (1987). Petitioner's claim—that the power available to prosecutors under the statute *could* be abused— proves too much, for many tools available to prosecutors can be misused in a way that violates the rights of innocent persons. As the Court of Appeals put it, in rejecting this claim when advanced below: "Every criminal law carries with it the potential for abuse, but a potential for abuse does not require a finding of facial invalidity." 837 F. 2d, at 648.

We rejected a claim similar to petitioner's last Term, in *Wheat* v. *United States*, 486 U. S. 153 (1988). In *Wheat*, the petitioner argued that permitting a court to disqualify a defendant's chosen counsel because of conflicts of interest— over that defendant's objection to the disqualification—would encourage the Government to "manufacture" such conflicts to deprive a defendant of his chosen attorney. *Id.*, at 163. While acknowledging that this was possible, we declined to fashion the *per se* constitutional rule petitioner sought in *Wheat*, instead observing that "trial courts are undoubtedly aware of [the] possibility" of abuse, and would have to "take it into consideration," when dealing with disqualification motions.

A similar approach should be taken here. The Constitution does not forbid the imposition of an otherwise permissible criminal sanction, such as forfeiture, merely because in some cases prosecutors may abuse the processes available to them, *e. g.*, by attempting to impose them on persons who should not be subjected to that punishment. Cf. *Brady* v.

*United States*, 397 U. S. 742, 751, and n. 8 (1970). Cases involving particular abuses can be dealt with individually by the lower courts, when (and if) any such cases arise.

## IV

For the reasons given above, we find that petitioner's statutory and constitutional challenges to the forfeiture imposed here are without merit. The judgment of the Court of Appeals is therefore

*Affirmed.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE STEVENS join, dissenting.*

Those jurists who have held forth against the result the majority reaches in these cases have been guided by one core insight: that it is unseemly and unjust for the Government to beggar those it prosecutes in order to disable their defense at trial. The majority trivializes "the burden the forfeiture law imposes on a criminal defendant." *Caplin & Drysdale, Chartered* v. *United States, ante,* at 625. Instead, it should heed the warnings of our District Court judges, whose day-to-day exposure to the criminal-trial process enables them to understand, perhaps far better than we, the devastating consequences of attorney's fee forfeiture for the integrity of our adversarial system of justice.[1]

---

* [This opinion applies also to No. 88–454, *United States* v. *Monsanto, ante,* p. 600.]

[1] See, *e. g., United States* v. *Rogers*, 602 F. Supp. 1332 (Colo. 1985); *United States* v. *Badalamenti*, 614 F. Supp. 194 (SDNY 1985); *United States* v. *Reckmeyer*, 631 F. Supp. 1191, 1197 (ED Va. 1986), aff'd on other grounds *sub nom. United States* v. *Harvey*, 814 F. 2d 905 (CA4 1987), rev'd *sub nom. In re Forfeiture Hearing as to Caplin & Drysdale, Chartered,* 837 F. 2d 637 (CA4 1988) (en banc); *United States* v. *Bassett*, 632 F. Supp. 1308, 1317 (Md. 1986), aff'd on other grounds *sub nom. United States* v. *Harvey*, 814 F. 2d 905 (CA4 1987); *United States* v. *Ianniello*, 644 F. Supp. 452 (SDNY 1985); *United States* v. *Estevez*, 645 F. Supp. 869 (ED Wis. 1986), app. dism'd for untimeliness, 852 F. 2d 239 (CA7 1988).

The criminal-forfeiture statute we consider today could have been interpreted to avoid depriving defendants of the ability to retain private counsel—and should have been so interpreted, given the grave "constitutional and ethical problems" raised by the forfeiture of funds used to pay legitimate counsel fees. *United States* v. *Badalamenti*, 614 F. Supp. 194, 196 (SDNY 1985). But even if Congress in fact required this substantial incursion on the defendant's choice of counsel, the Court should have recognized that the Framers stripped Congress of the power to do so when they added the Sixth Amendment to our Constitution.

I

The majority acknowledges, as it must, that *no* language in the Comprehensive Forfeiture Act of 1984 (Act), ch. 3, 98 Stat. 2040, as amended, codified in relevant part at 21 U. S. C. § 853 *et seq.* (1982 ed., Supp. V), expressly provides for the forfeiture of attorney's fees, and that the legislative history contains no substantive discussion of the question. *United States* v. *Monsanto, ante*, at 608–609, and n. 8.[2] The fact that "the legislative history and congressional debates are similarly silent on the use of forfeitable assets to pay stockbroker's fees, laundry bills, or country club memberships," *ante*, at 608–609, means nothing, for one cannot believe that Congress was unaware that interference with the payment of attorney's fees, unlike interference with these other expenditures, would raise Sixth Amendment concerns. See *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades Council*, 485 U. S. 568, 575 (1988).

---

[2] Indeed, the strongest statement on the question is the comment in the House Report: "Nothing in this section is intended to interfere with a person's Sixth Amendment right to counsel." H. R. Rep. No. 98–845, pt. 1, p. 19, n. 1 (1984). Even if the majority were correct that this statement is "nothing more than an exhortation for the courts to tread carefully in this delicate area," *United States* v. *Monsanto, ante*, at 609, n. 8, the majority does not explain why it proceeds to ignore Congress' exhortation to construe the statute to avoid implicating Sixth Amendment concerns.

Despite the absence of any indication that Congress intended to use the forfeiture weapon against legitimate attorney's fees, the majority—all the while purporting to "respect" the established practice of construing a statute to avoid constitutional problems, *Monsanto, ante,* at 611—contends that it is constrained to conclude that the Act reaches attorney's fees. The Court cannot follow its usual practice here, we are told, because this is not a "close cas[e]" in which "statutory language is ambiguous." *Ibid.* The majority finds unambiguous language in 21 U. S. C. § 853(a), which provides that when a defendant is convicted of certain crimes, the defendant "shall forfeit to the United States" any property derived from proceeds of the crime or used to facilitate the crime. I agree that § 853(a) is broad in language and is cast in mandatory terms.[3] But I do not agree with the majority's conclusion that the lack of an express exemption for attorney's fees in § 853(a) makes the Act *as a whole* unambiguous.

The majority succeeds in portraying the Act as "unambiguous" by making light of its most relevant provisions. As Judge Winter observed, the broad mandatory language of § 853(a) applies by its terms only to "'any person convicted' of the referenced crimes." *United States* v. *Monsanto,* 852 F. 2d 1400, 1410 (CA2 1988). Because third parties to whom assets have been transferred in return for services rendered are not "person[s] convicted," however, forfeiture of property in *their* possession is controlled by § 853(c) rather than by § 853(a). Section 853(c) provides: "Any such property that is subsequently transferred to a person other than the defendant *may be the subject of a special verdict of forfeiture* and thereafter shall be ordered forfeited to the United States" (emphasis added) if the third party fails to satisfy cer-

---

[3] As the majority acknowledges, so did Judge Winter, whose interpretation of the Act Caplin & Drysdale and Monsanto adopt in their briefs to this Court. See *Monsanto, ante,* at 607; *United States* v. *Monsanto,* 852 F. 2d 1400, 1409–1410 (CA2 1988) (en banc) (Winter, J., concurring).

tain requirements for exemption. Thus, § 853(c) does not, like § 853(a), provide that all property defined as forfeitable under § 853 "must" or "shall" be forfeited:[4] forfeitable property held by a third party presumptively "shall be ordered forfeited" only if it is included in the special verdict, and its inclusion in the verdict is discretionary.[5]

There is also considerable room for discretion in the language of § 853(e)(1), which controls the Government's use of postindictment protective orders to prevent the preconviction transfer of potentially forfeitable assets to third parties. That section provides:

> "Upon application of the United States, the court *may enter a restraining order or injunction* . . . or take any

---

[4] This language differs from the language in Federal Rule of Criminal Procedure 31(e), which was promulgated in 1972 to provide procedural rules for Congress' earlier forays into criminal forfeiture. The Rule provides: "If the indictment or the information alleges that an interest or property is subject to criminal forfeiture, a special verdict *shall* be returned as to the extent of the interest or property subject to forfeiture, if any." (Emphasis added.) Congress' decision to depart from mandatory language in § 853(c), where it fashioned a special verdict provision for assets transferred to third parties, is significant.

[5] That the Act is mandatory in its treatment of forfeiture of property in the defendant's hands, but not in its treatment of property transferred to third parties, is consistent with the distinction between civil forfeiture and criminal forfeiture. The theory (or, more properly, the fiction) underlying civil forfeiture is that the property subject to forfeiture is itself tainted by having been used in an unlawful manner. The right of the Government to take possession does not depend on the Government's ultimately convicting the person who used the property in an unlawful way, nor is it diminished by the innocence or bona fides of the party into whose hands the property falls. See *United States* v. *Stowell*, 133 U. S. 1 (1890). Criminal forfeiture, in contrast, is penal in nature: it is predicated on the adjudicated guilt of the defendant, and has punishment of the defendant as its express purpose. See generally Cloud, Forfeiting Defense Attorneys' Fees: Applying an Institutional Role Theory to Define Individual Constitutional Rights, 1987 Wis. L. Rev. 1, 18–19. Where the purpose of forfeiture is to punish the defendant, the Government's penal interests are weakest when the punishment also burdens third parties.

other action to preserve the availability of property . . . for forfeiture under this section . . . upon the filing of an indictment or information charging a violation . . . for which criminal forfeiture may be ordered . . . and alleging that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture under this section" (emphasis added).

The Senate Report makes clear that a district court may hold a hearing to "consider factors bearing on the reasonableness of the order sought." S. Rep. No. 98–225, p. 202 (1983). Even if the court chooses to enter an order *ex parte* at the Government's request, it may "modify the order" if it later proves to be unreasonable. *Id.*, at 203. In the course of this process, the court may also consider the circumstances of any third party whose interests are implicated by the restraining order. *Id.*, at 206, n. 42. Thus, the Government does not have an absolute right to an order preserving the availability of property by barring its transfer to third parties. Preconviction injunctive relief is available, but at the discretion of the district court.

The majority does not deny that §§ 853(c) and 853(e)(1) contain discretionary language. It argues, however, that the exercise of discretion must be "cabined by the purposes" of the Act. *Monsanto, ante,* at 613. That proposition, of course, is unassailable: I agree that discretion created by the Act cannot be used to defeat the purposes of the Act. The majority errs, however, in taking an overly broad view of the Act's purposes.

Under the majority's view, the Act aims to preserve the availability of *all* potentially forfeitable property during the preconviction period, and to achieve the forfeiture of *all* such property upon conviction. *Ibid.* This view of the Act's purposes effectively writes all discretion out of §§ 853(c) and 853(e)(1), because any exercise of discretion will diminish the Government's postconviction "take." But a review of the legislative history of the Act demonstrates that

the Act does not seek forfeiture of property for its own sake merely to maximize the amount of money the Government collects.[6] The central purposes of the Act, properly understood, are fully served by an approach to forfeiture that leaves ample room for the exercise of statutory discretion.

Congress' most systematic goal for criminal forfeiture was to prevent the profits of criminal activity from being poured into future such activity, for "it is through economic power that [criminal activity] is sustained and grows." Senate Report, at 191. "Congress recognized in its enactment of statutes specifically addressing organized crime and illegal drugs that the conviction of individual racketeers and drug dealers would be of only limited effectiveness if the economic power bases of criminal organizations or enterprises were left intact, and so included forfeiture authority designed to strip these offenders and organizations of their economic power." *Ibid.;* see also H. R. Rep. No. 98–845, pt. 1, p. 6 (1984) (criminal forfeiture statutes are "a bold attempt to attack the economic base of the criminal activity").[7]

---

[6] In adopting this view of the Act, the majority ignores the Government's concession at oral argument before the en banc Court of Appeals for the Second Circuit that the Act was not enacted as a revenue-raising measure. See *United States* v. *Monsanto,* 852 F. 2d, at 1407, and n. 1 (Winter, J., concurring). Thus, although the Government's interest in "using the profits of crime to fund [law-enforcement] activities" should perhaps not be "discounted," *Caplin & Drysdale, ante,* at 629, it is not dispositive. Nor does Congress' willingness to return forfeited funds to victims of crime instead of using them for law-enforcement purposes indicate that restitution is a primary goal of the Act. See *ante,* at 629–630. Restitution, in any event, is not a likely result in the typical case for which the Act was designed: one in which the property forfeited consists of derivative proceeds of illegal activity, rather than of stolen property that is readily traceable to a particular victim. See Cloud, 1987 Wis. L. Rev., at 20.

[7] The majority contends that "the desire to lessen the economic power of organized crime and drug enterprises . . . includes the use of such economic power to retain private counsel." *Caplin & Drysdale, ante,* at 630. "The notion that the Government has a legitimate interest in depriving criminals" — *before they are convicted* — "of economic power, even insofar as

Congress also had a more traditional punitive goal in mind: to strip convicted criminals of all assets purchased with the proceeds of their criminal activities. Particularly in the area of drug trafficking, Congress concluded that crime had become too lucrative for criminals to be deterred by conventional punishments. "Drug dealers have been able to accumulate huge fortunes as a result of their illegal activities. The sad truth is that the financial penalties for drug dealing are frequently only seen by dealers as a cost of doing business." *Id.*, at 2. The image of convicted drug dealers returning home from their prison terms to all the comforts their criminal activity can buy is one Congress could not abide.[8]

Finally, Congress was acutely aware that defendants, if unhindered, routinely would defeat the purposes of the Act by sheltering their assets in order to preserve them for their own future use and for the continued use of their criminal organizations. The purpose of §853(c) is to "to permit the voiding of certain pre-conviction transfers and so close a potential loophole in current law whereby the criminal forfeiture sanction could be avoided by transfers that were not 'arms' length' transactions." Senate Report, at 200–201.

With these purposes in mind, it becomes clear that a district court acts within the bounds of its statutory discretion

---

that power is used to retain counsel of choice" is more than just "somewhat unsettling," as the majority suggests. *Ibid.* That notion is constitutionally suspect, and—equally important for present purposes—completely foreign to Congress' stated goals. The purpose of the relation-back provision is to assure that assets *proved at trial* to be the product of criminal activity cannot be channeled into further criminal activity—not to strip defendants of their assets on no more than a showing of probable cause that they are "tainted." See *United States* v. *Bassett*, 632 F. Supp., at 1316; Comment, 61 N. Y. U. L. Rev. 124, 139 (1986). For its contrary view, the majority relies on nothing more than the rhetoric of the en banc Court of Appeals' majority opinion in *Caplin & Drysdale.*

[8] Congress' desire to maximize punishment, however, cannot be viewed as a blanket authorization of Government action that punishes the defendant before he is proved guilty.

when it exempts from preconviction restraint and postconviction forfeiture those assets a defendant needs to retain private counsel for his criminal trial. Assets used to retain counsel by definition will be unavailable to the defendant or his criminal organization after trial, even if the defendant is eventually acquitted. See Cloud, Government Intrusions Into the Attorney-Client Relationship: The Impact of Fee Forfeitures on the Balance of Power in the Adversary System of Criminal Justice, 36 Emory L. J. 817, 832 (1987). Thus, no important and legitimate purpose is served by employing § 853(c) to require postconviction forfeiture of funds used for legitimate attorney's fees, or by employing § 853(e)(1) to bar preconviction payment of fees. The Government's interests are adequately protected so long as the district court supervises transfers to the attorney to make sure they are made in good faith.[9] See Comment, 61 N. Y. U. L. Rev. 124, 138–139 (1986). All that is lost is the Government's power to punish the defendant before he is convicted. That power is not one the Act intended to grant.[10]

[9] Judge Winter noted that the same logic suggests that the forfeiture of assets the defendant uses to support himself and his family is unduly harsh and is not necessary to achieve the goals of the Act. *United States v. Monsanto*, 852 F. 2d, at 1405. The majority chides Judge Winter for suggesting that, once it is established that there is discretion to exclude assets used to pay attorney's fees and normal living expenses from forfeiture, the necessary result is that such assets *must* be excluded. *Monsanto, ante*, at 612–613. I find it exceedingly unlikely that a district court, instructed that it had the discretion to permit a defendant to retain counsel, would ever choose not to do so. Normal equitable considerations, combined with a proper regard for Sixth Amendment interests, would weigh so strongly in favor of that result that any "slippage" from permissive to mandatory language on Judge Winter's part seems to me entirely accurate as a predictive matter.

[10] The majority states in *Monsanto, ante*, at 610–611, that another forfeiture statute contemporaneous with the Act contains "the *precise* exemption from forfeiture which respondent asks us to imply into § 853," and suggests that this is evidence that "Congress understood what it was doing in

A careful analysis of the language of the Act and its legislative history thus proves that "a construction of the statute is fairly possible by which the [constitutional] question may be avoided." *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932).[11] Indeed, the prudentially preferable construction is also the only one that gives full effect to the discretionary language in §§ 853(c) and 853(e)(1). Thus, "if anything remains of the canon that statutes capable of differing interpretations should be construed to avoid constitutional issues . . . it surely applies here." *United States* v. *Monsanto*, 852 F. 2d, at 1409.

---

omitting such an exemption" from the Act. This argument is makeweight. The express exemption to which the majority refers involves the use of proceeds from publications and other accounts of a crime to:

"(i) satisfy a money judgment rendered in any court in favor of a victim of any offense for which such defendant has been convicted, or a legal representative of such victim; and

"(ii) pay for legal representation of the defendant in matters *arising from the offense for which such defendant has been convicted,* but no more than 20 percent of the total proceeds may be so used." Pub. L. 98–473, § 1406(c)(1)(B), 98 Stat. 2175, codified as 18 U. S. C. § 3681(c)(1)(B) (1982 ed., Supp. V) (emphasis added).

When this provision is read in context, it is clear that it concerns payment of attorney's fees related to postconviction civil suits brought against convicted defendants by their victims. It does not, therefore, constitute the *"precise* exemption" sought in these cases. Indeed, the provision cuts against the result the majority reaches. In light of Congress' decision to permit a convicted criminal to use wealth he has obtained by publicizing his crime to hire counsel to resist his victim's damages claims, it would be bizarre to think that Congress intended to be *more* punitive when it comes to a defendant's need for counsel *prior* to conviction, when the defendant's own liberty is at stake.

[11] For this reason, I need not rely on *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490, 500 (1979), in which the Court held that even the broadest statutory language may be interpreted as excluding cases that would raise serious constitutional questions, absent a clear expression of an affirmative intention of Congress to include those cases. See also *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades Council*, 485 U. S. 568 (1988). Under the *Catholic Bishop* approach, however, there could be no doubt that "the required 'clearest indication in the

## II

The majority has decided otherwise, however, and for that reason is compelled to reach the constitutional issue it could have avoided. But the majority pauses hardly long enough to acknowledge "the Sixth Amendment's protection of one's right to retain counsel of his choosing," let alone to explore its "full extent." *Caplin & Drysdale, ante,* at 626. Instead, *ante,* at 624, it moves rapidly from the observation that "'[a] defendant may not insist on representation by an attorney he cannot afford,'" quoting *Wheat* v. *United States,* 486 U. S. 153, 159 (1988), to the conclusion that the Government is free to deem the defendant indigent by declaring his assets "tainted" by criminal activity the Government has yet to prove. That the majority implicitly finds the Sixth Amendment right to counsel of choice so insubstantial that it can be outweighed by a legal fiction demonstrates, still once again, its "'apparent unawareness of the function of the independent lawyer as a guardian of our freedom.'" See *id.,* at 172 (STEVENS, J., dissenting), quoting *Walters* v. *National Assn. of Radiation Survivors,* 473 U. S. 305, 371 (1985) (STEVENS, J., dissenting).

### A

Over 50 years ago, this Court observed: "It is hardly necessary to say that the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice." *Powell* v. *Alabama,* 287 U. S. 45, 53 (1932). For years, that proposition was settled; the controversial question was whether the defendant's right to use his own funds to retain his chosen counsel was the outer limit of the right protected by the Sixth Amendment. See, *e. g., Chandler* v. *Fretag,* 348 U. S. 3, 9 (1954). The Court's subsequent decisions have made clear that an indigent defendant has the right to appointed counsel, see, *e. g., Gideon* v.

---

legislative history'" or statutory language is absent here. 485 U. S., at 578.

*Wainwright*, 372 U. S. 335 (1963), and that the Sixth Amendment guarantees at least minimally effective assistance of counsel, see, *e. g.*, *Strickland* v. *Washington*, 466 U. S. 668 (1984). But while court appointment of effective counsel plays a crucial role in safeguarding the fairness of criminal trials, it has never defined the outer limits of the Sixth Amendment's demands. The majority's decision in *Caplin & Drysdale* reveals that it has lost track of the distinct role of the right to counsel of choice in protecting the integrity of the judicial process, a role that makes "the right to be represented by privately retained counsel . . . the primary, preferred component of the basic right" protected by the Sixth Amendment. *United States* v. *Harvey*, 814 F. 2d 905, 923 (CA4 1987), rev'd *sub nom. In re Forfeiture Hearing as to Caplin & Drysdale, Chartered*, 837 F. 2d 637 (CA4 1988) (en banc).

The right to retain private counsel serves to foster the trust between attorney and client that is necessary for the attorney to be a truly effective advocate. See ABA Standards for Criminal Justice 4–3.1, p. 4–29 (commentary) (2d ed. 1980). Not only are decisions crucial to the defendant's liberty placed in counsel's hands, see *Faretta* v. *California*, 422 U. S. 806 (1975), but the defendant's perception of the fairness of the process, and his willingness to acquiesce in its results, depend upon his confidence in his counsel's dedication, loyalty, and ability. Cf. *Joint Anti-Fascist Refugee Committee* v. *McGrath*, 341 U. S. 123, 171–172 (1951) (Frankfurter, J., concurring). When the Government insists upon the right to choose the defendant's counsel for him, that relationship of trust is undermined: counsel is too readily perceived as the Government's agent rather than his own. Indeed, when the Court in *Faretta* held that the Sixth Amendment prohibits a court from imposing appointed counsel on a defendant who prefers to represent himself, its decision was predicated on the insight that "[t]o force a lawyer

on a defendant can only lead him to believe that the law contrives against him." 422 U. S., at 834.

The right to retain private counsel also serves to assure some modicum of equality between the Government and those it chooses to prosecute. The Government can be expected to "spend vast sums of money . . . to try defendants accused of crime," *Gideon* v. *Wainwright*, 372 U. S., at 344, and of course will devote greater resources to complex cases in which the punitive stakes are high. Precisely for this reason, "there are few defendants charged with crime, few indeed, who fail to hire the best lawyers they can get to prepare and present their defenses." *Ibid.* But when the Government provides for appointed counsel, there is no guarantee that levels of compensation and staffing will be even average.[12] Where cases are complex, trials long, and stakes high, that problem is exacerbated. "Despite the legal profession's commitment to *pro bono* work," *United States* v. *Bassett*, 632 F. Supp. 1308, 1316 (Md. 1986), aff'd on other grounds *sub nom. United States* v. *Harvey*, 814 F. 2d 905 (CA4 1987), even the best intentioned of attorneys may have no choice but to decline the task of representing defendants in cases for which they will not receive adequate compensation. See, *e. g., United States* v. *Rogers*, 602 F. Supp. 1332, 1349 (Colo. 1985). Over the long haul, the result of lowered compensation levels will be that talented attorneys will "decline to enter criminal practice. . . . This exodus of talented

---

[12] "Even in the federal courts under the Criminal Justice Act of 1964, 18 U. S. C. § 3006A, which provides one of the most generous compensation plans, the rates for appointed counsel . . . are low by American standards. Consequently, the majority of persons willing to accept appointments are the young and inexperienced." *Argersinger* v. *Hamlin*, 407 U. S. 25, 57, n. 21 (1972) (Powell, J., concurring in result). Indeed, there is evidence that "Congress did not design [the Criminal Justice Act] to be compensatory, but merely to reduce financial burdens on assigned counsel." See Winick, Forfeiture of Attorneys' Fees under RICO and CCE and the Right to Counsel of Choice: The Constitutional Dilemma and How to Avoid It, 43 U. Miami L. Rev. 765, 773, and n. 40 (1989).

attorneys could devastate the criminal defense bar." Winick, Forfeiture of Attorneys' Fees under RICO and CCE and the Right to Counsel of Choice: The Constitutional Dilemma and How to Avoid It, 43 U. Miami L. Rev. 765, 781 (1989). Without the defendant's right to retain private counsel, the Government too readily could defeat its adversaries simply by outspending them.[13]

The right to privately chosen and compensated counsel also serves broader institutional interests. The "virtual socialization of criminal defense work in this country" that would be the result of a widespread abandonment of the right to retain chosen counsel, Brief for Committees on Criminal Advocacy and Criminal Law of the Association of the Bar of the City of New York et al. as *Amici Curiae* in No. 88–454, p. 9, too readily would standardize the provision of criminal-defense services and diminish defense counsel's independence. There is a place in our system of criminal justice for the maverick and the risk taker and for approaches that might not fit into the structured environment of a public defender's office, or that might displease a judge whose preference for nonconfrontational styles of advocacy might influence the judge's appointment decisions. See Bazelon, The Defective Assistance of Counsel, 42 U. Cin. L. Rev. 1, 6–7 (1973); S. Kadish, S. Schulhofer, & M. Paulsen, Criminal Law and its Processes 32 (4th ed. 1983); cf. *Sacher* v. *United States*, 343 U. S. 1, 8–9 (1952) ("The nature of the proceedings presupposes, or at least stimulates, zeal in the opposing lawyers"). There is also a place for the employment of "specialized defense counsel" for technical and complex cases, see *United States* v. *Thier*, 801 F. 2d 1463, 1476 (CA5 1986) (concurring opinion), modification not relevant here, 809 F. 2d 249 (1987). The choice of counsel is the primary means for the defendant to establish the kind of defense he will put forward. See

---

[13] That the Government has this power when the defendant is indigent is unfortunate, but "[i]t is an irrelevancy once recognized." *United States* v. *Harvey*, 814 F. 2d, at 923.

*United States* v. *Laura*, 607 F. 2d 52, 56 (CA3 1979). Only a healthy, independent defense bar can be expected to meet the demands of the varied circumstances faced by criminal defendants, and assure that the interests of the individual defendant are not unduly "subordinat[ed] . . . to the needs of the system." Bazelon, 42 U. Cin. L. Rev., at 7.

In sum, our chosen system of criminal justice is built upon a truly equal and adversarial presentation of the case, and upon the trust that can exist only when counsel is independent of the Government. Without the right, reasonably exercised, to counsel of choice, the effectiveness of that system is imperiled.

### B

Had it been Congress' express aim to undermine the adversary system as we know it, it could hardly have found a better engine of destruction than attorney's-fee forfeiture. The main effect of forfeitures under the Act, of course, will be to deny the defendant the right to retain counsel, and therefore the right to have his defense designed and presented by an attorney he has chosen and trusts.[14] If the Government restrains the defendant's assets before trial, private counsel will be unwilling to continue, or to take on, the defense. Even if no restraining order is entered, the possibility of forfeiture after conviction will itself substantially

---

[14] There is reason to fear that, in addition to depriving a defendant of counsel of choice, there will be circumstances in which the threat of forfeiture will deprive the defendant of *any* counsel. If the Government chooses not to restrain transfers by employing § 853(e)(1), it is likely that the defendant will not qualify as "indigent" under the Criminal Justice Act. Potential private counsel will be aware of the threat of forfeiture, and, as a result, will likely refuse to take the case. Although it is to be hoped that a solution will be developed for a defendant who "falls between the cracks" in this manner, there is no guarantee that accommodation will be made in an orderly fashion, and that trial preparation will not be substantially delayed because of the difficulties in securing counsel. For discussions of this problem, see *United States* v. *Ianniello*, 644 F. Supp., at 456–457; *United States* v. *Badalamenti*, 614 F. Supp., at 197.

diminish the likelihood that private counsel will agree to take the case. The "message [to private counsel] is 'Do not represent this defendant or you will lose your fee.' That being the kind of message lawyers are likely to take seriously, the defendant will find it difficult or impossible to secure representation.'" *United States* v. *Badalamenti*, 614 F. Supp., at 196.

The resulting relationship between the defendant and his court-appointed counsel will likely begin in distrust, and be exacerbated to the extent that the defendant perceives his new-found "indigency" as a form of punishment imposed by the Government in order to weaken his defense. If the defendant had been represented by private counsel earlier in the proceedings, the defendant's sense that the Government has stripped him of his defenses will be sharpened by the concreteness of his loss. Appointed counsel may be inexperienced and undercompensated and, for that reason, may not have adequate opportunity or resources to deal with the special problems presented by what is likely to be a complex trial. The already scarce resources of a public defender's office will be stretched to the limit. Facing a lengthy trial against a better armed adversary, the temptation to recommend a guilty plea will be great. The result, if the defendant is convicted, will be a sense, often well grounded, that justice was not done.

Even if the defendant finds a private attorney who is "so foolish, ignorant, beholden or idealistic as to take the business," *ibid.*, the attorney-client relationship will be undermined by the forfeiture statute. Perhaps the attorney will be willing to violate ethical norms by working on a contingent-fee basis in a criminal case. See *Caplin & Drysdale, ante,* at 633, n. 10. But if he is not—and we should question the integrity of any criminal-defense attorney who would violate the ethical norms of the profession by doing so—the attorney's own interests will dictate that he remain ignorant of the source of the assets from which he is paid. Under § 853(c), a

third-party transferee may keep assets if "the transferee establishes . . . that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section." The less an attorney knows, the greater the likelihood that he can claim to have been an "innocent" third party. The attorney's interest in knowing nothing is directly adverse to his client's interest in full disclosure. The result of the conflict may be a less vigorous investigation of the defendant's circumstances, leading in turn to a failure to recognize or pursue avenues of inquiry necessary to the defense. Other conflicts of interest are also likely to develop. The attorney who fears for his fee will be tempted to make the Government's waiver of fee forfeiture the *sine qua non* for any plea agreement, a position which conflicts with his client's best interests. See *United States v. Badalamenti*, 614 F. Supp., at 196–197; *United States v. Bassett*, 632 F. Supp., at 1316, n. 5.

Perhaps most troubling is the fact that forfeiture statutes place the Government in the position to exercise an intolerable degree of power over any private attorney who takes on the task of representing a defendant in a forfeiture case. The decision whether to seek a restraining order rests with the prosecution, as does the decision whether to waive forfeiture upon a plea of guilty or a conviction at trial. The Government will be ever tempted to use the forfeiture weapon against a defense attorney who is particularly talented or aggressive on the client's behalf—the attorney who is better than what, in the Government's view, the defendant deserves. The specter of the Government's selectively excluding only the most talented defense counsel is a serious threat to the equality of forces necessary for the adversarial system to perform at its best. See *United States v. Monsanto*, 852 F. 2d, at 1404 (concurring opinion); *United States v. Rogers*, 602 F. Supp., at 1347, 1350; Cloud, 36 Emory L. J., at 829. An attorney whose fees are potentially

subject to forfeiture will be forced to operate in an environment in which the Government is not only the defendant's adversary, but also his own.

The long-term effects of the fee-forfeiture practice will be to decimate the private criminal-defense bar. As the use of the forfeiture mechanism expands to new categories of federal crimes and spreads to the States, only one class of defendants will be free routinely to retain private counsel: the affluent defendant accused of a crime that generates no economic gain. As the number of private clients diminishes, only the most idealistic and the least skilled of young lawyers will be attracted to the field, while the remainder seek greener pastures elsewhere. See Winick, 43 U. Miami L. Rev., at 781–782.

In short, attorney's-fee forfeiture substantially undermines every interest served by the Sixth Amendment right to chosen counsel, on the individual and institutional levels, over the short term and the long haul.

## C

We have recognized that although there is a "presumption in favor of [the defendant's] counsel of choice," *Wheat* v. *United States*, 486 U. S., at 158, 160, the right to counsel of choice is not absolute. Some substantial and legitimate governmental interests may require the courts to disturb the defendant's choice of counsel, as "[w]hen a defendant's selection of counsel, under the particular facts and circumstances of a case, gravely imperils the prospect of a fair trial," *id.*, at 166 (MARSHALL, J., dissenting), or threatens to undermine the orderly disposition of the case, see *Ungar* v. *Sarafite*, 376 U. S. 575, 589 (1964). But never before today has the Court suggested that the Government's naked desire to deprive a defendant of "'the best counsel money can buy,'" *Caplin & Drysdale, ante*, at 630, quoting *Morris* v. *Slappy*, 461 U. S. 1, 23 (1983) (BRENNAN, J., opinion concurring in result), is itself a legitimate Government interest that can justify the

Government's interference with the defendant's right to chosen counsel—and for good reason. "[W]eakening the ability of an accused to defend himself at trial is an advantage for the government. But it is not a legitimate government interest that can be used to justify invasion of a constitutional right." *United States* v. *Monsanto*, 852 F. 2d, at 1403 (Feinberg, C. J., concurring). And the *legitimate* interests the Government asserts are extremely weak, far too weak to justify the Act's substantial erosion of the defendant's Sixth Amendment rights.

The Government claims a property interest in forfeitable assets, predicated on the relation-back provision, § 853(c), which employs a legal fiction to grant the Government title in all forfeitable property as of the date of the crime. The majority states: "Permitting a defendant to use assets for his private purposes that, under this provision, will become the property of the United States if conviction occurs, cannot be sanctioned." *Monsanto, ante,* at 613. But the Government's insistence that it has a paramount interest in the defendant's resources "simply begs the constitutional question rather than answering it. Indeed, the ultimate constitutional issue might well be framed precisely as whether Congress may use this wholly fictive device of property law to cut off this fundamental right of the accused in a criminal case. If the right must yield here to countervailing governmental interests, the relation-back device undoubtedly could be used to implement the governmental interests, but surely it cannot serve as a substitute for them." *In re Forfeiture Hearing as to Caplin & Drysdale, Chartered,* 837 F. 2d, at 652 (dissenting opinion).

Furthermore, the relation-back fiction gives the Government no property interest whatsoever in the defendant's assets before the defendant is convicted. In most instances, the assets the Government attempts to reach by using the forfeiture provisions of the Act are derivative proceeds of crime, property that was not itself acquired illegally, but was purchased with the profits of criminal activity. Prior to con-

viction, sole title to such assets—not merely possession, as is the case in the majority's bank robbery example, *Caplin & Drysdale, ante,* at 626—rests in the defendant; no other party has any present legal claim to them.[15]   Yet it is in the pre-conviction period that the forfeiture threat (or the force of a § 853(e)(1) restraining order) deprives the defendant of use of the assets to retain counsel.   The Government's interest in the assets at the time of their restraint is no more than an interest in safeguarding fictive property rights, one which hardly weighs at all against the defendant's formidable Sixth Amendment right to retain counsel for his defense.

The majority contends, of course, that assets are only re-strained upon a finding of probable cause to believe that the property ultimately will be proved forfeitable, and that be-cause "the Government may restrain *persons* where there is a finding of probable cause that the accused has committed a serious offense," the Government necessarily has the right to

---

[15] Other analogies the majority and the Government have drawn are also inapt.   We do not deal with contraband, which the Government is free to seize because the law recognizes no right to possess it.   See *One 1958 Plymouth Sedan* v. *Pennsylvania,* 380 U. S. 693, 699 (1965).   Nor do we deal with instrumentalities of crime, which may have evidentiary value, and may also traditionally be seized by the Government and retained even if the defendant is not proved guilty, unless a party with a rightful claim to the property comes forward to refute the Government's contention that the property was put to an unlawful use.   See *Calero-Toledo* v. *Pearson Yacht Leasing Co.,* 416 U. S. 663, 679 (1974); Comment, 48 U. Chi. L. Rev. 960, 963–964 (1981).   As to the analogy to "jeopardy assessments" under the Internal Revenue Code, the Internal Revenue Service in that situation has a legal claim to the sums at issue at the time of the assessment, based upon substantive provisions of the Code.   Here, in contrast, the Government's claim will not arise until after conviction.   In addition, even if a jeopardy assessment were to deprive a taxpayer of the funds necessary to file a chal-lenge to the assessment in the Tax Court, the proceeding in that court is civil, and the Sixth Amendment therefore does not apply.   I agree with Judge Phillips when he observes that the constitutionality of a jeopardy as-sessment that deprived the defendant of the funds necessary to hire coun-sel to ward off a criminal challenge is not to be assumed.   See *United States* v. *Harvey,* 814 F. 2d, at 926.

restrain property the defendant seeks to use to retain counsel on a showing of probable cause as well. *Monsanto, ante,* at 615–616, citing *United States* v. *Salerno,* 481 U. S. 739 (1987). Neither the majority's premise nor its conclusion is well founded.

Although obtaining a restraining order requires a showing of probable cause, the practical effects of the threat of forfeiture are felt long before the indictment stage. Any attorney who is asked to represent the target of a drug or racketeering investigation—or even a routine tax investigation, as the facts of *Caplin & Drysdale* demonstrate—must think ahead to the possibility that the defendant's assets will turn out to be forfeitable. While the defendant is not formally restrained from using his assets to pay counsel during this period, the reluctance of any attorney to represent the defendant in the face of the forfeiture threat effectively strips the defendant of the right to retain counsel. The threat of forfeiture does its damage long before the Government must come forward with a showing of probable cause.

But even if the majority were correct that no defendant is ever deprived of the right to retain counsel without a showing of probable cause, the majority's analogy to permissible pretrial restraints would fail. The Act gives the Government the right to seek a restraining order solely on the basis of the indictment, which signifies that there has been a finding of probable cause to believe that the assets are tainted. When a defendant otherwise is incarcerated before trial, in contrast, the restraint cannot be justified by the fact of the indictment alone. In addition, there must be a showing that other alternatives will not "reasonably assure the appearance of the person [for trial] and the safety of any other person and the community." 18 U. S. C. § 3142(e) (1982 ed., Supp. V). No equivalent individualized showing that the defendant will likely dissipate his assets or fraudulently transfer them to third parties is necessary under the majority's reading of § 853(e)(1). Furthermore, the potential danger resulting

from the failure to restrain assets differs in kind and severity from the danger faced by the public when a defendant who is believed to be violent remains at large before trial.

Finally, even if the Government's asserted interests were entitled to some weight, the manner in which the Government has chosen to protect them undercuts its position. Under § 853(c), a third-party transferee may keep assets if he was "reasonably without cause to believe that the property was subject to forfeiture." Most legitimate providers of services will meet the requirements for this statutory exemption. The exception is the defendant's attorney, who cannot do his job (or at least cannot do his job well) without asking questions that will reveal the source of the defendant's assets. It is difficult to put great weight on the Government's interest in increasing the amount of property available for forfeiture when the means chosen are so starkly underinclusive, and the burdens fall almost exclusively upon the exercise of a constitutional right.[16]

Interests as ephemeral as these should not be permitted to defeat the defendant's right to the assistance of his chosen counsel.

### III

In my view, the Act as interpreted by the majority is inconsistent with the intent of Congress, and seriously under-

---

[16] Certainly criminal defendants "are not exempted from federal, state, and local taxation simply because these financial levies may deprive them of resources that could be used to hire an attorney." *Caplin & Drysdale, ante,* at 631–632. The Government's interest in raising revenue need not stand aside merely because the individual being taxed would rather spend the money by participating in a constitutionally protected activity. But I doubt that we would hesitate to reject as an undue burden on the exercise of a constitutional right a system that generally exempted personal-service transactions from taxation, but taxed payments to criminal-defense attorneys. In such circumstances, a clear-headed analysis of the Government's action would likely reveal that burdening the exercise of the defendant's Sixth Amendment right was not the unfortunate consequence of the Government's action, but its very purpose.

mines the basic fairness of our criminal-justice system.   That a majority of this Court has upheld the constitutionality of the Act as so interpreted will not deter Congress, I hope, from amending the Act to make clear that Congress did not intend this result.   This Court has the power to declare the Act constitutional, but it cannot thereby make it wise.

I dissent.