376 F.3d 260
 UNITED STATES of America, Plaintiff-Appellant,
v.
UNDETERMINED AMOUNT OF U.S. CURRENCY and Funds in the Following Accounts: First Union National Bank, Account number 2000000885359, held in the name of or on behalf of Mountain Top Farms, LLC; First Union National Bank, Account number 2075293094034, held in the name of or on behalf of R & V Warren Farms, Inc.; First Union National Bank, Account number 2000001217308, held in the name of or on behalf of R & V Warren Farms, Inc.; First Union National Bank, Account number 400189966, held in the name of or on behalf of R & V Warren Farms, Inc.; First Union National Bank, Account number 69502288, held in the name of or on behalf of R & V Warren Farms, Inc.; First Union National Bank, Account number 2000000578022, held in the name of or on behalf of Warren and Sandoval Farms, LLC; First Citizens Bank & Trust Company, Account number 001212748290, held in the name of or on behalf of PVR Produce, Inc.; First Citizens Bank & Trust Company, Account Number 001212759803, held in the name of or on behalf of R & V Warren Farms, Inc., Cattle Division; First Citizens Bank & Trust Company, Account number 001212760097, held in the name of or on behalf of R & V Warren Trucking Co., Inc.; Central Carolina Bank And Trust Company, as successor in interest to First Union National Bank account number 2000000885359, held in the name of or on behalf of Mountain Top Farms, LLC; Central Carolina Bank And Trust Company, as successor in interest to First Union National Bank account number 2000000578022, held in the name of or on behalf of Warren and Sandoval Farms, LLC; The Hartford Financial Services Group, Incorporated, annuity policy number 710473987 (associated with First Union National Bank account number 69502288), Defendants-Appellees, and
Robert Warren; Viki Warren; Central Carolina Bank And Trust Company; First Citizens Bank & Trust Company, Claimants-Appellees.
 No. 03-1977.
 United States Court of Appeals, Fourth Circuit.
 Argued: June 2, 2004.
 Decided: July 21, 2004.
 
 Appeal from the United States District Court for the Western District of North Carolina, Lacy H. Thornburg, J.
 
 
 1
 ARGUED: Thomas Richard Ascik, Assistant United States Attorney, Office of the United States Attorney, Asheville, North Carolina, for Appellant. John Keating Wiles, Cheshire, Parker, Schneider, Bryan & Vitale, Raleigh, North Carolina, for Appellees.
 
 
 2
 ON BRIEF: Robert J. Conrad, Jr., United States Attorney, Asheville, North Carolina, for Appellant. Sean P. Devereux, Asheville, North Carolina, for Appellee Robert Warren.
 
 
 3
 Before MOTZ and KING, Circuit Judges, and HANSEN, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.
 
 
 4
 Vacated and remanded by published opinion. Judge MOTZ wrote the opinion, in which Judge KING and Senior Judge HANSEN joined.
 
 OPINION
 DIANA GRIBBON MOTZ, Circuit Judge:
 
 5
 In this civil forfeiture case, the Government appeals an order directing that it release to the original owners property seized pursuant to a properly obtained warrant. Because the district court clearly erred in holding that the original owners' likely hardship from the Government's continued possession of the seized property out-weighed the risk of loss of that property, we vacate this order and remand for further proceedings.
 
 I.
 
 6
 Robert G. Warren and his wife Viki B. Warren operate R & V Warren Farms, a large farming concern devoted primarily to growing tomatoes, as well as a number of smaller, related businesses. From 1997 through 2001, R & V Warren Farms enrolled in the Federal Crop Insurance Program ("FCIP"), a government program funded by the Federal Crop Insurance Corporation ("FCIC"), which helps farmers insure against unavoidable losses caused by natural disaster. Under the FCIP, a farmer purchases insurance from a private insurance company, but the FCIC subsidizes the farmer's premiums, compensates the private insurance company for certain administrative expenses, and reinsures a portion of the risk.
 
 
 7
 The program essentially works by ascertaining a benchmark — the amount of a crop that a field produces under normal conditions — and indemnifying the farmer when the field produces less than this benchmark as a result of natural disaster. Because the FCIC generally determines payouts by the differential between the benchmark and actual production, it sets forth specific guidelines explaining how to measure and document these amounts. See 7 C.F.R. §§ 400.51-400.57 (2004); 7 C.F.R. § 457.8 (2004).
 
 
 8
 In the present case, the Government alleges that the Warrens intentionally skewed the benchmark and production numbers for their farms from crop year 1998 through crop year 2001 and thereby received (or sought to receive)[1] higher payouts than permitted under their FCIP insurance policies. Specifically, the Government asserts that the Warrens accomplished this in part by falsely attributing production from certain farms that had experienced a loss to other farms, thereby lowering production and increasing pay-outs at the "loss" farms (in which production amounts were falsely decreased) and, concomitantly, falsely increasing production amounts at other farms, which would raise the benchmark for those farms and potentially increase payouts in the future.
 
 
 9
 In March 2002, the Government applied for seizure warrants to authorize seizure of some of the Warrens' property, identified as subject to forfeiture. The Government supported its application for the seizure warrants with an extensive affidavit describing the Warrens' alleged misconduct involving the FCIP. This affidavit also detailed vehicles and bank accounts, which the Government sought to seize, and real property on which the Government proposed to place lis pendens. A magistrate judge concluded that the affidavit "establish[ed] probable cause to believe" that the bank accounts were "subject to seizure and that grounds exist[ed] for the issuance" of a warrant. Accordingly, the judge authorized issuance of a seizure warrant. The Government proceeded to seize $303,162.28 from the listed bank accounts; the Government also filed lis pendens against the listed real property.
 
 
 10
 Shortly thereafter, the Government filed complaints for civil forfeiture in rem against this real property, vehicles, and bank accounts. The complaint against the bank accounts sought forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) (2000 & Supp. I), which permits forfeiture of property "involved in" money laundering, and 18 U.S.C. § 981(a)(1)(C)(2000), which permits forfeiture of property "derived from proceeds" resulting from making false statements to the FCIC in violation of 18 U.S.C. § 1014 (2000). The complaint alleges that all of the funds in the bank accounts are forfeitable because "in whole or in part" they constituted the direct proceeds of the FCIP fraud or were involved in or facilitated money laundering transactions. Government affidavits similarly attest that the amounts in the bank accounts were "commingled [with] the illegally obtained crop insurance payments" and were "used to promote and carry on money laundering offenses" and that illegally obtained crop insurance payments were used to purchase or refinance the real property through cash payments in an effort to "conceal the origin" of that money.
 
 
 11
 The Warrens responded by filing an answer, as claimants to the property, asserting their interest in the seized property and objecting to its seizure. They also filed a motion asking the court to release "$350,000 from the seized [bank] accounts" so that they could pay their attorneys' fees. In support of this motion, the Warrens asserted that they satisfied the requirements for "hardship" release set forth in 18 U.S.C. § 983(f) (2000), which permits release pending the completion of forfeiture proceedings in limited circumstances.[2]
 
 
 12
 After the parties submitted additional memoranda and affidavits, including an affidavit from Robert Warren and an affidavit under seal from the Government, the district court held a hearing on the matter. On July 7, 2003, the court issued a memorandum and order directing the Government to release the amounts seized from the bank accounts, totaling $303,162.28, to an interest bearing account. The court directed that:
 
 
 13
 The attorneys for [the Warrens] shall present to the Clerk of Court unpaid bills for services rendered in connection with the criminal investigation as well as this action and any other related, pending civil forfeiture actions. Upon presentation of those bills, the Clerk of Court shall disburse the amount requested, after review by and written approval of this Court, and shall seal the invoices and any supporting documentation until further Order of this Court.
 
 
 14
 The Government noted a timely appeal.[3] We have jurisdiction over this "pretrial asset restraining order" under 28 U.S.C. § 1292(a)(1)(2000). See In re Assets of Martin, 1 F.3d 1351, 1355 (3d Cir.1993) (collecting cases).
 
 II.
 
 15
 Congress enacted § 983(f) as part of the Civil Asset Forfeiture Reform Act of 2000, Pub.L. No. 106-185, § 2, 114 Stat. 202, 208-09 (2000), to provide a mechanism for the release of property during the pendency of a civil forfeiture proceeding in certain circumstances in which the Government's continued possession would create a substantial hardship on persons claiming an interest in the property. The statute provides:
 
 
 16
 (1) A claimant under subsection (a) is entitled to immediate release of seized property if —
 
 
 17
 (A) the claimant has a possessory interest in the property;
 
 
 18
 (B) the claimant has sufficient ties to the community to provide assurance that the property will be available at the time of the trial;
 
 
 19
 (C) the continued possession by the Government pending the final disposition of forfeiture proceedings will cause substantial hardship to the claimant, such as preventing the functioning of a business, preventing an individual from working, or leaving an individual homeless;
 
 
 20
 (D) the claimant's likely hardship from the continued possession by the Government of the seized property outweighs the risk that the property will be destroyed, damaged, lost, concealed, or transferred if it is returned to the claimant during the pendency of the proceeding; and
 
 
 21
 (E) none of the conditions set forth in paragraph (8) applies.
 
 
 22
 .....
 
 
 23
 (8) This subsection shall not apply if the seized property —
 
 
 24
 (A) is contraband, currency, or other monetary instrument, or electronic funds unless such currency or other monetary instrument or electronic funds constitutes the assets of a legitimate business which has been seized;
 
 
 25
 (B) is to be used as evidence of a violation of the law;
 
 
 26
 (C) by reason of design or other characteristic, is particularly suited for use in illegal activities; or
 
 
 27
 (D) is likely to be used to commit additional criminal acts if returned to the claimant.
 
 
 28
 18 U.S.C. § 983(f)(1), (8). To obtain release under this statute, a claimant must submit a petition to the district court setting forth "the basis on which" the claimant has met all of these "requirements" for release. § 983(f)(3)(A),(B). The district court, in turn, can order release of properly seized property only if "the claimant demonstrates that the requirements ... have been met." § 983(f)(6).
 
 
 29
 The Government challenges the district court's finding that the Warrens satisfied the requirements of § 983(f)(1)(C), (D), (E), and (f)(8). With respect to § 983(f)(1)(E) and (f)(8), the district court found that the amounts in the bank accounts seized by the Government constituted "the assets of" the Warrens'"legitimate" tomato farming business, § 983(f)(8), and for this reason the statutory prohibition against the release of currency and the like did not bar release of the bank account funds. The court further found that the Warrens had satisfied the requirements of § 983(f)(1)(C) by demonstrating that "[c]ontinued possession by the Government of the currency will result in a substantial hardship to the [Warrens] who will be forced to sell their home and liquidate their remaining bank accounts and retirement plans [to pay their attorneys] if the funds are not released." Finally, the court found that the Warrens had also satisfied § 983(f)(1)(D) by proving that this hardship outweighed the risk that the released funds would be dissipated or lost.
 
 
 30
 We review the district court's interpretation of statutory provisions de novo, e.g., Scott v. United States, 328 F.3d 132, 137 (4th Cir.2003), but will reverse its findings of fact only if we find them clearly erroneous, see e.g., HSBC Bank USA v. F & M Bank Northern Virginia, 246 F.3d 335, 338 (4th Cir.2001); see also United States v. Funds Held in the Name or for the Benefit of Wetterer, 210 F.3d 96, 106 (2d Cir.2000) (reviewing legal determination de novo and factual findings for clear error in applying civil forfeiture statute); cf. United States v. Morgan, 224 F.3d 339, 342 (4th Cir.2000) (applying criminal forfeiture statute).
 
 III.
 
 31
 We need not here address the district court's holdings as to § 983(f)(1)(C), (E), or (f)(8) because we conclude that the court clearly erred in determining that the Warrens satisfied the requirements of § 983(f)(1)(D). See § 983(f)(requiring satisfaction of all of the listed requirements). Indeed, we believe the district court erred repeatedly in the factual findings it made with respect to those requirements. First, the court erred in finding that there was little to no "risk" that the bank account funds would be lost or dissipated if released to the Warrens. Second, it erred in assessing the hardship suffered by the Warrens from the Government's continued possession of the seized property. Finally, the court erred in finding that the Warrens' hardship outweighed the risk that the released funds would be lost or dissipated. We consider each of these errors in turn.
 
 A.
 
 32
 We note at the outset that § 983(f) places great emphasis on ensuring the preservation of any released property pending final disposition of forfeiture proceedings. Thus, in addition to § 983(f)(1)(D), which requires the district court to weigh the "risk" of loss, two other provisions of the statute also seek to ensure that released property will be available to the Government if the court ultimately orders forfeiture. A claimant must additionally demonstrate "sufficient ties to the community to provide assurance that the property will be available at the time of [the forfeiture] trial." § 983(f)(1)(B). Moreover, the statute gives a court the authority to "enter any order necessary to ensure that the value of the property is maintained while the forfeiture action is pending." See § 983(f)(7)(A).[4]
 
 
 33
 In the present case, the Warrens concede that they sought use of the released bank account funds to pay attorneys' fees, and the district court's order directing the distribution of the released funds anticipates, and in fact specifically provides for, that use. The "risk" of "loss" or dissipation of these funds, therefore, appears to be almost certain.
 
 
 34
 Nevertheless, the district court found this risk negligible. The court reasoned that even if the Warrens spent all of the seized bank account funds on attorneys' fees prior to the civil forfeiture trial, if the court ultimately ordered forfeiture, it could substitute other property owned by the Warrens for those funds and in that way satisfy the forfeiture order. Section 983(f), however, gives no indication that it permits substitution of assets in this manner.
 
 
 35
 But even if substitution of assets might in some circumstances be appropriate, the risk of loss here is clearly significant. The district court could only reach a contrary conclusion by (1) forecasting the amount to which the Government would be entitled if successful at a civil forfeiture trial and (2) regarding as a proper substitute for the released funds other Warren property also subject to forfeiture.[5] Specifically, the district court predicted that the Government would ultimately be entitled to forfeiture of only $2,074,062 — the amount of FCIC insurance payouts that the forfeiture complaint identified as obtained through false statements. And the court believed that the more than $2 million in real property owned by the Warrens on which the Government had attached lis pendens "assure[d] that property equal in value" to the amounts in the bank accounts would "be available at the time of trial," eliminating any risk of loss of the funds in the bank accounts.
 
 
 36
 We believe it far too early to determine what amount the Government may be able to prove subject to forfeiture at trial.[6] But even if the district court's finding on this question did not constitute error, clearly the court did err in allowing other forfeitable property to substitute for the released bank account funds.
 
 
 37
 A magistrate judge found "probable cause to believe" that all of the Warren property described in the Government's affidavit — the real property and the bank accounts — was "subject to seizure." The district court never held this probable cause finding erroneous. Thus, if the Government prevails at the civil forfeiture trial, it will be entitled to forfeiture of the Warrens' listed real property and listed bank account funds. See § 981(f) ("All right, title, and interest in property [subject to forfeiture] ... shall vest in the United States upon commission of the act giving rise to forfeiture under this section."). The availability of the listed forfeitable real property cannot compensate the Government for possible dissipation of the listed forfeitable bank account funds. See United States v. Swank Corp., 797 F.Supp. 497, 502-03 (E.D.Va.1992) (holding in the context of in personam criminal forfeiture that "[a]ny order of forfeiture for substitute assets would have to be satisfied out of something which was not itself subject to forfeiture").
 
 
 38
 Accordingly, the district court clearly erred in finding that the Warrens demonstrated little or no risk of dissipation of the bank account funds; indeed, the "risk" was nearly guaranteed.
 
 B.
 
 39
 The district court also erred in evaluating the "likely hardship" faced by the Warrens from the Government's continued possession of the bank account funds. Section 983(f)(1)(D) requires the court to assess the claimants'"likely hardship" in order to determine whether that hardship outweighs the risk of loss. Here, the district court reviewed the Warrens' circumstances and determined that they had shown a "substantial hardship" as required by § 983(f)(1)(C). The court then relied on its finding of "substantial hardship" under § 983(f)(1)(C) to conclude that this hardship outweighed what it viewed as a near-zero risk of loss.[7]
 
 
 40
 Section 983(f)(1)(D), however, clearly anticipates some instances in which a hardship, though "substantial," will not be severe enough to outweigh the risk of loss. Therefore, even accepting the district court's finding of substantial hardship under § 983(f)(1)(C), we must determine if the Warrens produced sufficient evidence to sustain the district court's implicit finding as to the relative severity of the "likely hardship" they faced.
 
 
 41
 Although § 983(f) never defines "hardship," it does provide some examples of the hardship Congress deemed sufficient to provide grounds for release of seized property, i.e. hardship "preventing the functioning of a business, preventing an individual from working, or leaving an individual homeless." § 983(f)(1)(C). These examples supply a basis on which to assess the Warrens' asserted hardship.
 
 
 42
 Before the district court, prior to their indictment on any criminal charges, the Warrens represented that they needed the bank account funds in part to pay "back bills," including legal work performed in connection with the civil forfeiture proceeding. In response, the district court ordered the release of funds to pay for legal services, including those "rendered in connection with ... this action and any other related, pending civil forfeiture actions." Although, as recounted above, after noting its appeal in this case, the Government indicted the Warrens, and the district court has since interpreted its order to permit the release of funds to pay the Warrens' attorneys' fees in their criminal case, this appeal challenges only the district court's pre-indictment finding that their inability to hire counsel to assist them "in connection with" the civil forfeiture case, and a possible future criminal action, constituted a hardship outweighing the risk of loss.
 
 
 43
 Moreover, although the bank accounts purportedly belong to Warren corporate entities, the Warrens have signatory authority over the accounts and have made no effort to distinguish between amounts that they intend to use for their personal attorneys' fees and those (if any) to be paid for legal services provided to the corporate entities. Nor have the Warrens suggested that the continued operation of their corporate entities necessitated release of the bank account funds. Indeed, the district court stated that the amounts released were "not to be used to continue the business." Thus, the Warrens do not contend that they sought release of the seized funds to alleviate the hardship of being forced to close their businesses.
 
 
 44
 In fact, the Warrens did not, and do not, even assert that, absent release of the bank account funds, they could not pay their attorneys. Rather, counsel for the Warrens acknowledged before the district court that the Warrens "could pay" their attorneys "and they'd probably have [$]125[,000], $130,000 left over." The district court observed that the Warrens "own a home worth between $150,000 and $200,000 and have [non-seized] bank accounts, business and personal, and retirement accounts which total approximately $78,000." Thus, the Warrens' asserted hardship is not that they are unable to pay their attorneys, but that they might have to liquidate certain assets in order to do so.[8]
 
 
 45
 This, then, is the substance of the Warrens' claimed hardship: Absent release of the seized bank account funds, they might need to liquidate certain assets to pay attorneys' fees, at least some of which are personal attorneys' fees incurred to pursue their interests in a civil forfeiture action. Clearly, the Warrens' hardship — the possible need to pay their attorneys' fees in a civil forfeiture action — falls far short in degree and kind from the hardships recognized by Congress in § 983(f). The latter all involve serious dislocation of claimants' daily existence; the Warrens' asserted hardship does not.
 
 
 46
 Moreover, in contrast to the statutory exemplars of hardship, there is some indication that the statute does not generally contemplate court-ordered release of seized property to pay attorneys fees arising from a civil forfeiture action.[9] In particular, Congress has explicitly provided for the legal "[r]epresentation" of civil forfeiture claimants under certain conditions. See 18 U.S.C. § 983(b) (providing that when a claimant is "financially unable to obtain representation by counsel," a court may, if the court has appointed counsel in a related criminal case, "authorize [appointed] counsel to represent" the claimant in the civil forfeiture claims and that when "the property subject to forfeiture ... is being used" by the claimant as "a primary residence," the court shall, at the claimant's request, "insure that the person is represented by an attorney for the Legal Services Corporation with respect to the claim"). Congress would hardly have expressly permitted appointment of legal counsel for civil forfeiture claimants in § 983(b) if it had anticipated that released assets could generally be used for this purpose under § 983(f).
 
 
 47
 Nor do we agree with the district court that the Warrens' asserted hardship is of constitutional dimension. Even if we were to accept the district court's dubious conclusion that the Warrens had a pre-indictment Sixth Amendment right to counsel at the time the court ordered the funds released,[10] the fact remains that a criminal defendant has no constitutional right to use forfeitable property to pay counsel. See Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624-33, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989); United States v. Monsanto, 491 U.S. 600, 614-16, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989); Farmer, 274 F.3d at 802-03.
 
 
 48
 For these reasons, assuming that the need to pay attorneys' fees can properly be considered a hardship under § 983(f), the Warrens have utterly failed to demonstrate that their purported hardship should be afforded much weight for purposes of the balancing requirement set forth in § 983(f)(1)(D). The district court clearly erred in finding to the contrary.
 
 C.
 
 49
 Finally, we turn to the balancing requirement itself. Our analysis above requires the conclusion that the district court erred in finding that the Warrens demonstrated, as required by § 983(f)(1)(D), that their "likely hardship" from the Government's continued possession of the seized bank account funds outweighed the "risk" that those seized funds would be lost or dissipated if released to them. Indeed, the risk of dissipation seems almost certain and plainly not out-weighed by the Warrens' limited asserted hardship.
 
 IV.
 
 50
 In sum, we hold that the district court clearly erred in finding that the Warrens had satisfied the requirements of § 983(f)(1)(D). Accordingly, we vacate the district court's order releasing the seized bank account funds and remand for further proceedings consistent with this opinion.
 
 
 VACATED AND REMANDED
 
 
 
 Notes:
 
 
 [1]
 The Warrens filed claims totaling $4,959,444 for the 2001 crop year, but the claims involving two counties, which account for $3,805,610, have not yet been paid and are presently in arbitration
 
 
 [2]
 In this motion, the Warrens alternatively asserted rights underUnited States v. Farmer, 274 F.3d 800, 805 (4th Cir.2001) (holding that a criminal defendant has a due process right to a hearing to challenge probable cause as to untainted assets seized pursuant to civil forfeiture when those assets are needed to hire counsel in his criminal case). The district court, however, acted pursuant to § 983(f), not Farmer, and on appeal, the Warrens have disclaimed reliance on Farmer.
 
 
 [3]
 On October 8, 2003, after appealing the judgment in this case, the Government indicted the Warrens on criminal charges stemming from their involvement with FCIP program. No claims involving the criminal case are before us
 
 
 [4]
 A court may, of course, order release of liquid assets — currency, monetary instruments, and electronic funds — which probably would not be available for return in precisely the same formSee § 983(f)(8)(A). But a court can only order the release of currency and the like if they constitute the "assets of a legitimate business which has been seized." Id. In this context, it seems unlikely the value of the currency would be "lost"; rather, a "legitimate business" would presumably use the currency to continue operating as a going concern. Accordingly, if a court ultimately ordered forfeiture, business assets would remain available to assure return to the government of an amount equal to the previously seized currency.
 
 
 [5]
 The district court also based its determination that there was little risk of loss on the fact that "the sum of $3.8 million is owed to the Claimants by Fireman's Fund which is withholding payment pending the investigation." That $3.8 million, however, represents the Warrens' claim against a private insurance company participating in FCIP; we find it highly unlikely that, if the Government succeeds in proving that it is entitled to forfeiture of the Warrens' assets, this insurer would make any further payments to the Warrens
 
 
 [6]
 Although we need not and do not here decide the total amount to which the Government may ultimately be entitled, we note that the question appears more complicated than the district court's analysis suggests. The district court arrived at what it determined to be the maximum forfeitable sum ($2,074,062) by totaling the amount of fraudulently obtained insurance payments as described in the Government affidavit used to establish probable cause for the seizure; at trial, however, the Government may offer additional evidence on this and other points affecting the value of forfeitable propertySee § 983(c)(2). Further, the Government contends that the entire amount received by the Warrens through the FCIP (roughly $8.5 million) is forfeitable as "proceeds traceable to" the Warrens' false statements to the FCIC in violation of § 1014. See 18 U.S.C. § 981(a)(1)(C); cf. United States v. 3814 NW Thurman Street, 164 F.3d 1191, 1196 (9th Cir.1999) (viewing entire amount of loan made by bank in reliance on claimant's false statements as the "proceeds" of violation of 18 U.S.C. § 1014 and other statutes). And finally, the Government submitted evidence that the Warrens used the real property against which it filed lis pendens to launder the illegally obtained funds, raising the possibility that all of that real property is properly forfeitable as well. See 18 U.S.C. § 981(a)(1)(A) (entitling the Government to forfeiture of "[a]ny property ... involved in a transaction ... in violation of" the money laundering statutes) (emphasis added).
 
 
 [7]
 The district court merely recited its finding that the Warrens satisfied the "substantial hardship" requirement of § 983(f)(1)(C) because "[c]ontinued possession by the Government of the currency will result in a substantial hardship to the Claimants who will be forced to sell their home and liquidate their remaining bank accounts and retirement plans if the funds are not released," and then noted in conclusory fashion that "[t]his hardship outweighs the risk that pending trial, property equal in value to the currency released will be destroyed." (emphasis added).
 
 
 [8]
 In this connection, we cannot accept the district court's finding that the Warrens would, in fact, have to "sell their home and liquidate [all of] their remaining bank accounts and retirement plans" to pay their attorneys if the court did not order release of the seized bank account funds. The district court placed the burden of proof on the Government to "present ... evidence that the Claimants have other substantial assets with which to hire counsel" and based its determination that the Warrens did not have other assets on the fact that the government "did not" present such evidence. This was error. Under § 983(f)(6), the Warrens clearly bore the burden to "demonstrate[ ]" their hardship and that they did not, actually have assets available to pay counsel. § 983(f)(6). At oral argument, the Warrens could offer no explanation as to why they could not, if necessary, simply take out a mortgage on their home
 
 
 [9]
 The Government argues that a claimant's purported inability to pay attorneys' fees can never, as a matter of law, constitute a hardship warranting release under § 983(f). We need not and do not decide whether the need for funds to pay attorneys can ever constitute a statutorily-recognized hardship; for purposes of the present appeal, we assume that it can
 
 
 [10]
 The district court observed that the Warrens voluntarily used untainted funds to avoid foreclosure on properties subject tolis pendens, thereby generating a benefit for the Government. The court then appeared to reason that, because the Warrens could have instead used the untainted funds to pay counsel and criminal defendants have a qualified Sixth Amendment right to use untainted funds to pay counsel, the Warrens should now be permitted to "use ... the [tainted] funds sought which are necessary to their defense by counsel of choice."